**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NEUMA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04 C 4213 |
| | ) | |
| WELLS FARGO & COMPANY, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Neuma, Inc. ("Neuma") entered into a viatical settlement with Rudy Ockhuysen ("Ockhuysen"), an employee on disability leave from Defendant Wells Fargo & Company ("Wells Fargo"), in which Ockhuysen assigned his rights as a beneficiary under his employer-sponsored group life insurance policy to Neuma in exchange for a lump sum payment. Shortly thereafter, Wells Fargo terminated Ockhuysen's employment pursuant to a company policy of limiting disability leaves to 30 months. As neither Neuma nor Ockhuysen subsequently converted the group policy to an individual policy, the policy lapsed.

Neuma brings claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for recovery of benefits, breach of fiduciary duty, and failure to provide requested documents. Neuma asserts that Wells Fargo breached its fiduciary duty to Neuma as an assignee-beneficiary by neglecting to advise Neuma, when Neuma contacted Wells Fargo to verify Ockhuysen's employment status, that Ockhuysen's employment was scheduled to terminate 30 days later in accordance with Wells Fargo's leave policy. Neuma further asserts that Wells Fargo inadequately responded to Neuma's request for documents related to Ockhuysen's group life policy. Neuma seeks damages, an order reinstating Ockhuysen's coverage, a declaratory judgment that Wells Fargo pay the face amount of the policy upon Ockhuysen's death, and a statutory per-diem penalty for Wells Fargo's alleged failure to produce documents.

The parties have filed cross-motions for summary judgment on the breach of fiduciary duty and document request claims. Wells Fargo further moves for summary judgment on Neuma's

claims for recovery of benefits and declaratory relief, moves to strike an affidavit submitted by one of Neuma's attorneys, and moves for sanctions. For the reasons presented here, Wells Fargo's motions are granted and Neuma's motion for summary judgment is denied.

## BACKGROUND[1]

### A. The Parties

Plaintiff Neuma, an Illinois corporation, (Pl.'s 56.1 ¶ 1), purchases life settlements and viatical settlements from individuals. (Def.'s 56.1 ¶ 1.) A viatical settlement is accomplished when a person, typically an individual with a terminal illness, assigns his or her rights under a life insurance policy to Neuma and, in exchange, receives a discounted lump sum payment from Neuma of the face value of the insurance policy. (Pl.'s 56.1 ¶ 14.) After the assignment is made, Neuma continues to pay any applicable premiums and, upon the insured's death, receives payment under the policy as the designated beneficiary. (*Id.* ¶ 15.) Viatical settlements may involve individual or group insurance policies. (Def.'s 56.1 ¶ 1.)

Wells Fargo, a Delaware corporation with its principal place of business in California, (Pl.'s 56.1 ¶ 2), is an integrated financial services company with approximately 150,000 employees.

---

[1] The facts presented here are drawn from the parties' Local Rule 56.1 statements, filed in conjunction with the parties' cross-motions for summary judgment. Defendant Wells Fargo & Company's Local Rule 56.1 Statement of Uncontested Material Facts is cited here as "Def.'s 56.1." Neuma, Inc.'s Local Rule 56.1(B)(3)(A) Response to Defendant's Rule 56.1 Statement of Uncontested Material Facts and Local Rule 56.1(B)(3)(B) Statement of Additional Uncontested Material Facts is cited here as "Pl.'s 56.1 Resp." and "Pl.'s 56.1 Resp. Addnl." Defendant Wells Fargo & Company's Reply to Plaintiff's Local Rule 56.1(B)(3)(A) Response to Wells Fargo's Local Rule 56.1 Statement of Uncontested Material Facts and Response to Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Uncontested Material Facts is cited here as "Def.'s 56.1 Reply" and "Def.'s 56.1 Reply Addnl."

Plaintiff's Rule 56.1 Statement of Uncontested Material Facts is cited here as "Pl.'s 56.1." Defendant Wells Fargo & Company's Local Rule 56.1(b)(3)(A) Response to Plaintiff's Rule 56.1 Statement of Uncontested Material Facts, and Local Rule 56.1(b)(3)(B) Statement of Additional Uncontested Material Facts is cited here as "Def.'s 56.1 Resp." and "Def.'s 56.1 Resp. Addnl." Plaintiff Neuma has not filed a reply to Wells Fargo's response to Neuma's 56.1 statement; accordingly, the court, for purposes of Neuma's motion for summary judgment, accepts as true any additional factual allegations in Wells Fargo's response to Neuma's 56.1 statement, provided Wells Fargo supports those allegations with citations to the record. *See* N.D. Ill. R. 56.1(a) & (b)(3)(B).

To the extent that the parties dispute one another's factual assertions, the court notes the disagreement where relevant and appropriate.

(Def.'s 56.1 ¶ 2.)  Ockhuysen, who is not a party to this lawsuit, worked at Wells Fargo's San Francisco office from 1978 until December 16, 1998, beginning as a bank teller and eventually becoming an operations analyst in Well's Fargo's courier network.  (*Id.* ¶¶ 17, 21; Pl.'s 56.1 ¶ 4.) In 1995, Ockhuysen fell ill and reduced his work schedule to four days a week from five.[2] (Ockhuysen Dep., at 51:10–25.)  On June 17, 1996, he went on disability leave from Wells Fargo. (Def.'s 56.1 ¶ 18.)  Prior to his going on leave, in May 1996, Wells Fargo implemented a policy under which the company would terminate the employment of any employee on leave in excess of 30 months.  (*Id.* ¶ 19.)  Ockhuysen was informed of this policy and that his employment would terminate on December 16, 1998.  (*Id.* ¶ 20.)  Ockhuysen did not return to work, and in accordance with Wells Fargo's policy, Wells Fargo terminated his employment on December 16, 1998, after 30 months of leave.  (*Id.* ¶ 21.)

## B.    Ockhuysen's Life Insurance with Wells Fargo

As of October 1998, Ockhuysen was a participant in Wells Fargo's group life insurance plan (the "Plan").  (Def.'s 56.1 ¶ 3.)  Wells Fargo was the plan sponsor, plan administrator, and fiduciary of the Plan.  (Pl.'s 56.1 ¶ 6.)  From 1992 to July 1999, Wells Fargo Senior Counsel Cara Sheean was responsible for all in-house employee benefit plans.  (Pl.'s 56.1 Resp. Addnl. ¶ 3.)  The insurance coverage under the Plan was provided by Metropolitan Life Insurance Company ("MetLife") pursuant to policy number 4839-G1.  (Pl.'s 56.1 ¶ 7; Def.'s 56.1 ¶ 4.)  Ockhuysen's life insurance policy had a face amount of $252,000.  (Pl.'s 56.1 ¶ 8.)  In or around September 1997, however, Ockhuysen received a 50% accelerated benefit option in the amount of $139,000 against the face amount of the policy.  (Def.'s 56.1 ¶ 52; Def.'s 56.1 Resp. Addnl. ¶ 7.)  Under the terms of the Plan, a participating employee's group life insurance benefits would end on the last day of

---

[2]    Plaintiff asserts that Ockhuysen was "afflicted with a terminal illness and forced to reduce his work schedule."  (Pl.'s 56.1 ¶ 9.)  In the cited portion of Ockhuysen's deposition testimony, however, Ockhuysen refers only to his "illness," without any further identification, and without any indication that it was terminal.  (Ockhuysen Dep., at 51:10–25.)  As of August 2005, it appears that Ockhuysen was still alive.  (Pl.'s Resp., at 5.)  For purposes of this lawsuit, however, the nature and likely course of Ockhuysen's illness are not relevant.

the calendar month in which the participant's employment with Wells Fargo ended. (Def.'s 56.1 ¶ 24.) An employee could, however, convert the policy to an individual life insurance policy by completing an application during a "conversion period" of 31 days after termination of group life benefits. (*Id.* ¶¶ 25–26.)

Wells Fargo distributed information about the Plan to its employees in several ways. First, Wells Fargo issued "Benefits Books" to all employees, including those on leave, that described key terms and conditions of the Plan. (*Id.* ¶¶ 27–28.) Wells Fargo's 1998 Benefits Book provided that employees on approved leaves of absence could maintain their life insurance coverage by paying the premiums for the duration of the leave (to a maximum of 30 months). (*Id.* ¶¶ 29–30.) Both the 1996 and 1998 Benefits Books explained that employees could convert their group life policies to individual policies by submitting a completed conversion application form to the appropriate insurance carrier and by paying the first premium within 31 days after coverage ended. (*Id.* ¶ 32.) The 1996 and 1998 books also stated that Wells Fargo, as plan administrator, had "full discretionary authority to administer and interpret" the Plan. (*Id.* ¶ 31.) Second, Wells Fargo provided copies of the Plan upon request.[3] (*Id.* ¶ 33.) Third, Wells Fargo provided its employees, including those on leave, with an Employee Handbook that described policies and procedures applicable to its employees. (*Id.* ¶¶ 34–35.) The 1997 Employee Handbook informed employees that their "employment will end" if a leave reached 30 months. (*Id.* ¶ 36.) During Ockhuysen's employment with Wells Fargo, he received copies of Benefits Books and Employee Handbooks annually, and received a copy of the actual insurance policy upon requesting it from Wells Fargo in 1998.[4] (*Id.* ¶ 37.)

---

[3]    Neuma disputes this by contending that Wells Fargo failed to make the Plan available to Neuma upon Neuma's request. (Pl.'s 56.1 Resp. ¶ 33.) Neuma does not contest, however, that Wells Fargo provided copies of the Plan to its employees, which is the context of Wells Fargo's assertion. The court thus accepts this fact as true.

[4]    Neuma disputes that Ockhuysen received copies of these documents, contending that Wells Fargo's assertion is unsupported by its citations to Ockhuysen's deposition testimony. (Pl.'s 56.1 Resp. ¶ 37.) In the cited portions of his testimony, however, Ockhuysen did
(continued...)

## C.    The Viatical Agreement with Neuma

On July 22, 1998, Ockhuysen completed a viatical broker application from Wilbanks & Associates ("Wilbanks"), a viatical settlements broker.  (Def.'s 56.1 ¶ 51.)  Ockhuysen had contacted Wilbanks to inquire about viatical settlements upon a referral from other Wells Fargo employees.[5]  (Pl.'s 56.1 ¶ 12.)  Wilbanks forwarded the application to Neuma.  (Def.'s 56.1 ¶ 51.)  In the application, Ockhuysen stated that his policy had a face amount of $252,000 and that he had previously received a 50% accelerated benefit option.  (*Id.* ¶ 52.)  Ockhuysen also stated in the application that he was not working; that he had last worked on June 15, 1996 (roughly 25 months prior); and that he was no longer able to work.  (*Id.* ¶ 53.)

On September 24, 1998, Ockhuysen executed a viatical settlement agreement with Neuma (the "Agreement") whereby he agreed to sell to Neuma all his rights as a beneficiary under the Plan.  (*Id.* ¶¶ 7, 55.)  Under the terms of the Agreement, Neuma paid Ockhuysen $73,670 in exchange for his naming Neuma the "absolute assignee" of his group life coverage under the Plan.  (*Id.* ¶¶ 8, 58.)  Ockhuysen thus assigned to Neuma his title interest in the Plan and Policy, including the right to convert it to an individual policy.[6]  (Pl.'s 56.1 ¶ 16.)  Wells Fargo was not a party to the Agreement.  (Def.'s 56.1 ¶ 57.)

---

[4](...continued)
acknowledge that he had received Benefits Books and Employee Handbooks "on an annual basis" (Ockhuysen Dep., at 15:4–9); that he requested and received "the actual policy" from Wells Fargo in 1998 (*Id.* at 15:16–21, 16:4–12, 17:2–11); and that he received excerpts from the 1997 Employee Handbook in 1998.  (*Id.* at 35: 1–17.)  The court thus disregards Neuma's challenge to this assertion.

[5]    The record does not identify those other employees, but is undisputed that Neuma has entered into viatical agreements with other Wells Fargo employees.  (Def.'s 56.1 ¶ 49.)
    Neuma further asserts that Ockhuysen inquired about viatical settlements because he was "struggling financially" and desired to "generate additional income while on leave." (Pl.'s 56.1 ¶ 12.)  Defendant correctly notes that Neuma's citation to the record does not support this assertion.  Although Neuma's characterization of Ockhuysen's motivation may well be correct, given Ockhuysen's disability leave, the court cannot accept as true any factual assertions that Neuma fails to support with a citation to supporting materials in the record.  *See* N.D. Ill. R. 56.1(a).  In any event, Ockhuysen's motivation is not relevant to the parties' dispute here.

[6]    On October 26, 1998, Neuma designed a trustee, Larry Silver, as beneficiary.  (Def.'s 56.1 ¶¶ 66–69.)

Before Neuma enters into a viatical agreement, Neuma requires certain documents and information from the seller of the policy. (*Id.* ¶ 38.) Neuma requires, *inter alia*, contact information; medical history and records; and copies of a seller's life insurance policy, summary plan description, and benefit books if the insurance is provided through an employer. (*Id.* ¶ 39.) Neuma calls the seller's insurance company or employer to confirm that the policy is in effect, and to obtain information about the face value, premiums, and cash value of the policy. (*Id.* ¶ 42.) After executing a viatical agreement and paying the seller, Neuma takes various steps to confirm that the information provided remains accurate. (*Id.* ¶ 43.) Neuma may contact the seller, the seller's doctor or counsel, or the seller's designated estate representative. (*Id.* ¶¶ 43–44.) Neuma also provides a seller with 12 pre-addressed postcards annually, along with a "contact letter" asking the seller to provide Neuma with information about changes in address, telephone number, or physician. (*Id.* ¶ 45.) According to Neuma, the postcards "ask [the seller] one or two questions" (FRCP 30(b)(6) Dep., at 16:24, 17:1–2.) Although it is not clear what those questions are, the postcards do not appear to ask for the seller's employment status; rather, the purpose of the monthly postcards is merely to let Neuma know that the insured is still alive. (*Id.* at 78:2–7.) To this end, Neuma may also check death indexes on the internet using the seller's social security number. (Def.'s 56.1 ¶ 46.)

When Neuma purchases a policy under an employer-sponsored group life insurance plan, however, it appears that Neuma does not routinely contact the employer after execution of the viatical agreement, or impose the same kind of reporting requirements on the employer that it imposes on the employee-seller. In fact, when asked whether Neuma specifically tells employers that they have an affirmative responsibility to contact Neuma if the employee's employment ceases, Neuma President David Irwin Binter responded, "I don't know. . . . I don't know if anybody at the office would know." (*Id.* ¶ 47; FRCP 30(b)(6) Dep., at 32:2–11.) According to Neuma Account Executive Regina Miller, employers who contact Neuma to report changes in information about an employee who has assigned a group life policy to Neuma do so only to report changes in the

insurance carrier. (Def.'s 56.1 Resp. Addnl. ¶ 3; Miller Dep., at 10:6–7, 23:3–14.)

Defendant asserts that Neuma, in entering into the Agreement, obtained from Ockhuysen "information about the terms of Ockhuysen's life insurance policy, including a copy of the policy itself (i.e., a copy of the Plan), as well as a copy of the Wells Fargo Benefits Book regarding the Plan." (Def.'s 56.1 ¶ 65.) Neuma does not deny receipt of a Benefits Book.[7] Neuma does, however, deny having received a copy of the Policy, which it contends is not the equivalent of the Plan, and further denies having received a copy of the Plan prior to entering into the Agreement. (Pl.'s 56.1 Resp. ¶ 65.) In support of its denial, Neuma cites to portions of its own 56.1 statement that assert that Neuma never received Plan materials after it requested them from Wells Fargo in June or July 2000. (Pl.'s 56.1 ¶¶ 31–33.) That statement does not, however, support Neuma's assertion that it did not receive Plan materials from Ockhuysen in the fall of 1998. Upon reviewing the record, the court concludes that Wells Fargo provides ample and uncontradicted evidence that Neuma did in fact receive copies of the Policy and the Plan upon entering into the agreement with Ockhuysen. In her deposition, Neuma Account Executive Miller was asked, "Did Neuma collect documents regarding Ockhuysen's life insurance policy?" and "Did Neuma collect the policy itself for Ockhuysen?" She answered "yes" to both questions. (Miller Dep., at 39:18–23.) Although Miller could not recall precisely when Neuma collected those documents from Ockhuysen, she testified that policy documents were typically collected before Neuma executed viatical agreements. (*Id.* at 41:2–9.) Moreover, Ockhuysen testified that he provided "the group life plan" to both Neuma and Wilbanks. (Ockhuysen Dep., at 17:14–23, 18:4–8.) He also testified that he gave Neuma "a copy of the Wells Fargo group life plan summary." (*Id.* at 44:2–8.) The court thus concludes that Neuma received copies of the Plan, the Policy, and a Wells Fargo Benefits Book from Ockhuysen upon entering into the Agreement.[8]

---

[7]    Neither party identifies which Benefits Book Neuma received. Given that the Agreement was executed in late 1998, the court presumes it was the 1998 Benefits Book.

[8]    The court further notes that Neuma offers no explanation for its purported willingness
(continued...)

In keeping with Neuma's policies, the Agreement required Ockhuysen to "keep in regular contact with Neuma, via monthly postcards provided by Neuma, or telephone calls." (Def.'s 56.1 ¶ 59.) Ockhuysen also executed a form entitled "Representations and Warranties of Insured" in which Ockhuysen warranted that he would "immediately notify Neuma of any material change in any of the information provided herein." (*Id.* ¶ 62.) Neuma acknowledges that a change in an employee's employment status could be a "material change." (*Id.* ¶ 63; FRCP 30(b)(6) Dep., at 44:4–14.)

On October 30, 1998, a Wells Fargo Personnel Specialist signed a form acknowledging Ockhuysen's assignment of life insurance benefits to Neuma, and on November 9, 1998, a MetLife employee signed the form as well. (Def.'s 56.1 ¶¶ 70–71.) On November 10, 1998, Wells Fargo faxed a copy of this acknowledgment form to Neuma. (*Id.* ¶ 72.) Included in the fax were copies of postcards provided by MetLife entitled "Important Notice to Assignee." (*Id.* ¶ 73.) The postcards stated that the assignee should contact MetLife "[i]f the privilege of obtaining an individual policy of life insurance becomes available and [the assignee] desire[s] to exercise such privilege." (*Id.*) Presumably, the purpose of the MetLife postcards, which included a toll-free telephone number, was to assist the assignee in obtaining information about converting a group life policy to an individual policy once benefits terminated.

### D. The November 16, 1998 Conversation

As noted, Ockhuysen's employment was scheduled to terminate on December 16, 1998, upon conclusion of 30 months of disability leave. (Def.'s 56.1 ¶¶ 19–20.) On November 16, 1998, a month prior to the scheduled termination and before Neuma had tendered payment to Ockhuysen under the Agreement,[9] Neuma Chief Financial Officer Matt Heidrich contacted Edna Fickett, a Wells

---

[8](...continued)
to pay more than $73,000 for beneficiary rights to an insurance policy without first obtaining a copy of the policy.

[9]     The parties do not identify when Neuma paid Ockhuysen, other than that it was after November 16, 1998, and before Ockhuysen's employment terminated on December 16, 1998.
(continued...)

Fargo Survivor Benefits Personnel Specialist, to verify that Ockhuysen was employed by Wells Fargo and covered under the Plan. (Pl.'s 56.1 ¶ 18; Heidrich Aff. ¶¶ 1, 4–5, Ex. 3 to Pl.'s 56.1.) Fickett confirmed that Ockhuysen was then currently employed by Wells Fargo. (Pl.'s 56.1 ¶ 19.) Heidrich proceeded to ask Fickett for the balance due on Ockhuysen's policy premiums for the remainder of 1998 and for 1999, and whether Neuma could pay the entire 1998 and 1999 balance in one lump-sum payment. (*Id.*) Fickett responded that the balances for 1998 and 1999 were $52.98 and $635.76, respectively, and that Wells Fargo actually preferred a lump-sum payment. (*Id.* ¶¶ 20–21.) Fickett further informed Heidrich that if Ockhuysen passed away during 1999, Wells Fargo would submit to Neuma a pro-rata refund of any unused premiums. (*Id.* ¶ 22; Heidrich Aff. ¶ 8, Ex. 3 to Pl.'s 56.1.) On November 18, 1998, Fickett sent a fax to Neuma, confirming that Neuma would submit premium payments on Ockhuysen's life insurance policy, and that "in the event of Rudy's demise, Wells Fargo will submit a refund to the beneficiary if there is a remaining credit balance due to payments made in advance." (Fax from Fickett to Neuma of 11/18/98, Ex. B to Heidrich Aff., Ex. 3 to Pl.'s 56.1.)

Fickett did not, in either the conversation of November 16, 2002 or the fax of November 18, 2002, inform Heidrich that Ockhuysen's employment was scheduled to terminate on December 16, 1998 or that his life insurance benefits would thereby terminate as well on December 31, 1998.[10] (Pl.'s 56.1 ¶ 24; Answer ¶ 22.) Plaintiff asserts that based on the conversation and fax from Fickett,

---

[9](...continued)
(Ockhuysen Dep., at 80:10–24 (stating that Ockhuysen had already received the money from Neuma when his employment ended).)

[10]     Wells Fargo purports to contest this fact as unsupported by Plaintiff's citation to the record. (Def.'s 56.1 Resp. ¶ 24.) In fact, however, Heidrich's affidavit, the document cited by Neuma, asserts that "[a]t no time prior to March 2, 2000 did Fickett, or any other person employed by Wells Fargo, disclose to me that Rudy's employment was scheduled to terminate on December 16, 1998 and that Neuma's life insurance benefits would terminate on December 31, 1998." (Heidrich Aff. ¶ 10, Ex. 3 to Pl.'s 56.1.) Moreover, in its answer to the complaint, Wells Fargo admitted Neuma's allegation that "Prior to March, 2000, Wells Fargo did not notify Neuma of any change in Ockhuysen's employment or insurance eligibility status under the Plan or the MetLife Policy." (Am. Compl. ¶ 22; Answer ¶ 22.) The court thus accepts as undisputed the fact that Wells Fargo did not, in the November 1998 communications between Fickett and Heidrich, inform Neuma of Ockhuysen's scheduled termination and loss of benefits.

Neuma determined that Ockhuysen would remain employed by Wells Fargo, and that his insurance coverage would remain intact, through at least 1999. (Pl.'s 56.1 ¶ 25.) Neuma cites Heidrich's affidavit for this assertion (Heidrich Aff. ¶ 11, Ex. 3 to Pl.'s 56.1); Wells Fargo disputes it, but fails to cite any evidence in support of its challenge. (Def.'s 56.1 Resp. ¶ 25.) Without commenting here on the reasonableness of this belief, the court accepts Plaintiff's assertion that Heidrich, and thus Neuma, believed after the November 1998 communications with Fickett that Ockhuysen would remain employed and his coverage intact through 1999. On November 30, 1998, Neuma sent Wells Fargo a check for $635.04, representing the total premiums due under the Policy for the period of December 1, 1998 through December 1, 1999. (Pl.'s 56.1 ¶ 25.) Wells Fargo negotiated the check and forwarded payment for the Policy to MetLife. (*Id.*)

### E. Ockhuysen's Termination and Neuma's Failure to Convert the Policy

Wells Fargo, in accordance with its policy of limiting leaves to 30 months, terminated Ockhuysen on December 16, 1998 after he had exhausted his 30 months of leave.[11] (Def.'s 56.1 ¶¶ 9, 81.) Despite his warranting to report "any material change" in his circumstances, (*Id.* ¶¶ 62–63), Ockhuysen did not inform Neuma of his termination. (*Id.* ¶ 81.) He explained: "I already received the funds from Neuma prior to that date. So, I never really paid attention anymore after I received the funds . . . ." (Ockhuysen Dep., at 80:10–24.) Nonetheless, it is undisputed that Neuma, after execution of the Agreement, remained in regular contact with Ockhuysen via letters to and telephone calls with Ockhuysen, and that Ockhuysen on a monthly basis returned the postcards provided by Neuma, apparently without ever mentioning his termination. (Def.'s 56.1 ¶ 76.)

Neuma admits it has "no way of knowing" whether Wells Fargo was aware that Ockhuysen

---

[11] Plaintiff asserts that during Ockhuysen's disability leave, Wells Fargo on two occasions erroneously terminated his employment and benefits, and only reinstated them after being contacted by Ockhuysen. (Pl.'s 56.1 ¶¶ 10–11.) Defendant disputes these allegations as unsupported by Plaintiff's citations to the record. (Def.'s 56.1 Resp. ¶¶ 10–11.) Although the court, upon reviewing Ockhuysen's deposition testimony and the exhibits thereto, finds that Wells Fargo erroneously terminated Ockhuysen only once, in August 1997, the court does not consider this issue relevant to Neuma's claims.

had not informed Neuma of his termination, and Neuma does not charge Wells Fargo with having actual knowledge that Ockhuysen failed to do so.[12] (Def.'s 56.1¶ 82, quoting FRCP 30(b)(6) Dep., at 100:17-22.) Wells Fargo does not say whether it did have such knowledge, but it is undisputed that Wells Fargo did not notify Neuma of Ockhuysen's termination until March 2, 2000.

Under the Plan, Ockhuysen's group life insurance coverage ceased on December 31, 1998, the last day of the calendar month in which Ockhuysen's employment ended. (Def.'s 56.1 ¶¶ 24, 83.) At that point, there was a 31-day conversion period during which either Ockhuysen or Neuma could convert Ockhuysen's group life policy to an individual policy.[13] (*Id.* ¶¶ 25–26.) It is undisputed that neither Ockhuysen nor Neuma took any steps to convert the policy during the 31-day conversion period. (*Id.* ¶ 85.)

### F.  Neuma Learns of Ockhuysen's Termination and End of Insurance Coverage

On July 1, 1999, five months after the end of the conversion period in which Ockhuysen's group life insurance policy could have been converted to an individual policy, Wells Fargo changed its group life insurance carrier from MetLife to Minnesota Life Insurance Company ("Minnesota Life"). (Def.'s 56.1 ¶ 86.) On December 17, 1999, Neuma sent Wells Fargo a check for $635.04 which purported to cover the premiums for life insurance coverage for Ockhuysen for 2000. (*Id.* ¶ 87; Pl.'s 56.1 ¶ 27.) Neuma sent the check to the post office box maintained by Wells Fargo for collecting insurance premiums for all employees for whom premium payments were not made through payroll deductions. (Def.'s 56.1 ¶¶ 75, 88.) In any given month, according to Wells Fargo,

---

[12]    Neuma denies Wells Fargo's assertion that Neuma is not making such an argument, (Pl.'s 56.1 Resp. ¶ 82), but the page Neuma cites to support its denial does not appear in the record.

[13]    Wells Fargo asserts, and Neuma does not dispute, that Ockhuysen or Neuma had until January 17, 1999 to convert the policy, (Def.'s 56.1 ¶ 84), but the court is less certain of this date. The parties apparently calculate the 31-day conversion period from the date of Ockhuysen's termination on December 16, 1998; however, the parties elsewhere assert, and the Plan documents confirm, that the conversion period runs from the date benefits end. (Def.'s 56.1 ¶ 26; Group Life Plan, Ex. A to Sheean Aff., at WF 000047 (defining the conversion period as 31 days after "the date your Life Benefits end . . . .").) It thus appears that Ockhuysen or Neuma had until February 1, 1999, to convert the group life policy to an individual policy.

there may have been "hundreds of checks . . . sent to this post office box." (*Id.* ¶ 75.) Wells Fargo did not negotiate this check. (*Id.* ¶ 89.)

During the week of February 7, 2000, after learning that the check Neuma sent on December 17, 1999, had not cleared, Neuma Chief Financial Officer Heidrich contacted Wells Fargo to inquire about the check. (*Id.* ¶ 90.) On March 2, 2000, Wells Fargo Survivor Benefits Personnel Specialist Fickett spoke to Heidrich and informed him that Ockhuysen's employment had ended in December1998, and that his group life insurance coverage had terminated on December 31, 1998. (*Id.* ¶ 91; Pl.'s 56.1 ¶ 28; Heidrich Dep., at 28:8–16.) Fickett further advised Heidrich that because Neuma had not converted Ockhuysen's group policy to an individual policy within the conversion period, Neuma had forfeited its coverage under the policy. (Pl.'s 56.1 ¶ 28.) It is undisputed that the March 2, 2000 conversation with Fickett marked the first time Heidrich learned that Ockhuysen's Wells Fargo employment and insurance benefits had been terminated. (Def.'s 56.1 ¶ 92; Heidrich Dep., at 39:8–22.)

### G.    Neuma's Request for Documents

In a letter dated July 31, 2000 and apparently faxed to Wells Fargo, Neuma's attorney, Lisa J. Brodsky of the Aronberg law firm, requested documents and information regarding the Plan and asked Wells Fargo to respond by August 15, 2000. (Def.'s 56.1 ¶ 95; Letter from Brodsky to Fickett of 7/31/2000 [hereinafter, "the July 31 Letter"], Ex. E to Sheean Aff., Ex. to Def.'s 56.1.) Enclosed with Ms. Brodsky's Letter was a copy of an unsigned letter from Nathan H. Lichtenstein of the Aronberg firm, with no letterhead, dated June 28, 2000, in which Lichtenstein requested that Wells Fargo provide "a copy of the master insurance Policy, plan document and related amendments thereto, summary plan description and all other documents constituting the benefit plan and insurance policy under which the policy was maintained." (Def.'s 56.1 ¶¶ 96–97; Letter from Lichtenstein to Fickett of 6/28/2000, Ex. E to Sheean Aff., Ex. to Def.'s 56.1.) Wells Fargo asserts, and Neuma does not dispute, that prior to July 31, 2000, Wells Fargo had never received a copy

of the June 28, 2000 letter.[14] (*Id.* ¶ 97; Pl.'s 56.1 Resp. ¶ 97.) Although it is undisputed that Wells Fargo responded to Neuma's request on August 16, 2000, (Def.'s 56.1 ¶ 101), the parties hotly contest the nature and sufficiency of the documents Wells Fargo provided with its response.

Wells Fargo asserts that it provided, on August 16, 2000, "a copy of the master Plan document, as well as relevant excerpts of the 1998 Benefits Book (which comprised the Plan's 'summary plan description') that was in effect at the time of Ockhuysen's termination of employment." (*Id.*) In the letter accompanying the documents and addressed to Brodsky, Wells Fargo stated that it was "enclosing a copy of the master insurance Policy and plan documents, applicable to Mr. Ockhuysen's coverage." (Letter from Hernandez to Brodsky of 8/16/2000, Ex. F to Sheean Aff., Ex. to Def.'s 56.1.) Neuma denies that Wells Fargo's response included copies of the "master Plan document" or the 1998 Benefits Book, and asserts that none of the documents provided by Wells Fargo contained the Plan's "summary plan description." (Pl.'s 56.1 ¶ 31; Pl.'s 56.1 Resp. ¶ 101.) Neuma also charges Wells Fargo with failing to produce the "group life insurance policy" and any Benefits Book for 1996. (Pl.'s 56.1 ¶ 31.) In support of its position, Neuma provides the court with the May 9, 2005 affidavit of Howard Fishman (the "Fishman Affidavit"), an attorney with the Aronberg firm and "one of the attorneys with primary responsibility for the handling of" this action, who identifies an attached exhibit as "[a] genuine and complete copy" of all documents provided by Wells Fargo on August 16, 2000. (Pl.'s 56.1 ¶¶ 31–32; Fishman Aff. ¶¶ 1–2, Ex. 5 to Pl.'s 56.1.) Wells Fargo moves to strike the Fishman affidavit and all assertions in Neuma's Local Rule 56.1 materials that rely on the Fishman Affidavit. (Defendant Wells Fargo & Company's Motion to Strike the Affidavit of Howard J. Fishman and Motion for Sanctions [hereinafter "Def.'s Mot. to Strike"], at 1.) Before discussing this motion, however, the

---

[14]     Neuma has also produced an unsigned letter, dated June 29, 2000, the text of which appears identical to the June 28, 2000 letter. (Def.'s 56.1 ¶ 100.) The purpose of the June 29 letter is not apparent, as Neuma does not allege that it ever sent this letter, and Wells Fargo denies having received it. (*Id.*; Def.'s 56.1 Resp. ¶ 29.) The most reasonable inference is that both the June 28 and 29 letters are drafts that were never sent, or that Wells Fargo, for whatever reason, did not receive.

court observes that the exhibit to the Fishman affidavit actually supports Wells Fargo's assertion that Wells Fargo did produce portions of the 1998 Benefits Book relevant to life insurance coverage, a "summary plan description," and the "group" or "master" life insurance policy.[15]  It is undisputed that Wells Fargo did not produce a 1996 Benefits Book, and did not produce the entire 1998 Benefits Book.  (Pl.'s 56.1 Resp. Addnl. ¶¶ 28–29.)  The court notes, however, that the chapters Wells Fargo allegedly omitted from the 1998 Benefits Book relate to non-life insurance benefits, such as health care and investment benefits, (1998 Benefits Book, Table of Contents, Ex. A to Fishman Aff., Ex. 5 to Pl.'s 56.1, at iii–viii), and that the portions of the 1998 Benefits Book that Neuma claims Wells Fargo provided comprise, save for the two-page Appendix, all the materials constituting a "summary plan description."  (Sheean Dep., at 41:21–25, 42:19–23, 43:3–6.)

### 1.      Well's Fargo's Motion to Strike the Fishman Affidavit

Wells Fargo moves to strike the Fishman Affidavit in its entirety, or, in the alternative, Paragraphs 2 and 9 thereof,[16] on grounds of Neuma's failure to disclose Fishman as a witness, lack

---

[15]      This exhibit consists of two documents.  First, a document titled "1998 Benefits Book" contains a Table of Contents; Chapter 1 ("Your Benefits Program"); excerpts from Chapter 2 ("Life Events"); Chapter 7 ("Life and Accident Plans"); and Chapter 10 ("When Benefits End").  (1998 Benefits Book, Ex. A to Fishman Aff., Ex. 5 to Pl.'s 56.1.)  According to Wells Fargo Senior Counsel Cara Sheean, Chapters 1, 7, 10, plus an appendix titled "Appendix: Administration" of the 1998 Benefits Book (the "Appendix"), together constitute the "summary plan description."  (Sheean Dep., at 41:21–25, 42:19–23, 43:3–6.)  The Appendix, a total of two pages, contains a chart listing ERISA plans sponsored by Wells Fargo.  (Ex. B to Sheean Aff., Ex. to Def.'s 56.1.)

The second part of the exhibit is a twenty-one page document entitled "Group Life Plan, Wells Fargo & Company" that details the terms and conditions of Wells Fargo's life insurance benefits, and contains a page in which MetLife, as underwriter, identifies "Group Policy No.: 4839-G1" and "[c]ertifies that the benefits as described herein are provided under and subject to the terms and conditions of the Group Policy issued to [Wells Fargo]."  (Group Life Plan, Ex. A to Fishman Aff., Ex. 5 to Pl.'s 56.1, at Neuma 0190.)  Neuma acknowledges that the "group life insurance policy" is the same as the "'master' life insurance policy," (Pl.'s 56.1 Resp. Addnl. ¶ 9), which Sheean describes as the "group policy and certificate of coverage that's issued by the insurance company."  (Sheean Dep., at 30:7–9.)  The "Group Life Plan" document provided by Wells Fargo, with its certificate of coverage from MetLife, appears to fit this description, and Neuma offers no competing definition.

Neither party explains what is meant by "master Plan document."  The court can only assume that it means "master life insurance policy."

[16]      Paragraph 2 states: "On August 16, 2000, Wells Fargo produced certain plan documents to Neuma.  A genuine and complete copy of Wells Fargo's August 16, 2000 [sic] and
(continued...)

of foundation, and violation of the "Lawyer-Advocate Rule." (Def.'s Mot. to Strike, at 1–2.) The court agrees that the Fishman affidavit is improper and must be stricken in its entirety.

Under Rule 37(c) of the Federal Rules of Civil Procedure, a court must exclude evidence provided by a witness that the party did not disclose during discovery, if the failure to disclose is without substantial justification and is not harmless. *See* FED. R. CIV. P. 37(c); *In re Thomas Consol. Indus., Inc.*, 456 F.3d 719, 726 (7th Cir. 2006); *Musser v. Gentiva Health Serv.*, 356 F.3d 751, 758 (7th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory"). Neuma did not disclose Fishman as an individual likely to have discoverable information in its Rule 26(a)(1) initial disclosures, (Neuma, Inc.'s Initial Disclosures Pursuant to F.R.C.P. 26(a), Ex. A to Defendant Wells Fargo & Company's Memorandum of Law in Support of its Motion to Strike the Affidavit of Howard J. Fishman and Motion for Sanctions [hereinafter, "Def.'s Strike Mem."], at 1–2), or in its interrogatory responses. (Neuma, Inc.'s Answers to Wells Fargo & Company's Revised First Set of Interrogatories to Plaintiff, Ex. B to Def.'s Strike Mem., at 2–3.) Neuma contends that its failure to disclose Fishman was harmless because Wells Fargo "sent documents directly to [Fishman]" on August 16, 2000 and thus was aware that Fishman was a potential witness, and because the Fishman affidavit contains no "substantive testimony." (Neuma, Inc.'s Response to Defendant's Motion to Strike the Affidavit of Howard J. Fishman and Motion for Sanctions [hereinafter, "Pl.'s Strike Resp."], at 3–4.) *See Fenje v. Feld*, 301 F. Supp. 2d 781, 814–15 (N.D. Ill. 2003) (finding no violation of Rule 37(c) where either the plaintiff was "well aware of [the affiants'] roles and their potential as witnesses" or the affidavits merely purported to authenticate exhibits).

Neuma's argument is without merit. Wells Fargo did not, as Neuma asserts, send documents directly to Fishman on August 16, 2000; rather, the correspondence was addressed to Lisa J. Brodsky at the Aronberg firm. (Letter from Hernandez to Brodsky of 8/16/2000, Ex. F to

---

[16](...continued)
all documents enclosed with its correspondence, is attached hereto as Exhibit A." (Fishman Aff. ¶ 2, Ex. 5 to Pl.'s 56.1.) Paragraph 9 asserts: "To date, Wells Fargo has never produced any summary plan description or copy of the group life insurance policy issued to Wells Fargo by MetLife." (*Id.* ¶ 9.)

Sheean Aff., Ex. to Def.'s 56.1.)  There is no indication that Fishman was at all involved in the Wells Fargo matter in August 2000; indeed, the first time Fishman's name appears in the record is as the signatory to a letter sent from the Aronberg firm to Wells Fargo on July 24, 2003—nearly three years later.  (Letter from Fishman to Sheean of 7/24/2003, Ex. J to Sheean Aff., Ex. to Def.'s 56.1.)  Thus, Wells Fargo would not have considered Fishman a potential witness with information relating to what documents the Aronberg firm received on August 16, 2000.  If anything, only Brodsky would come to mind as a potential witness, and, perhaps tellingly, Neuma has not submitted an affidavit from Brodsky.  Nor can Neuma rely on its argument that because Brodsky and Fishman were both attorneys at the Aronberg firm, Fishman is a potential witness with firsthand knowledge of what documents were delivered to Brodsky.  (Pl.'s Strike Mem., at 7.)  By this logic, every attorney at the Aronberg firm—there were thirty-eight listed on its letterhead in July 2000—could submit an affidavit in this case, and Wells Fargo would have had to consider each of them a potential witness and depose them all.  Finally, the Fishman affidavit indeed includes "substantive testimony" in that it testifies as to what documents Wells Fargo provided—facts at the heart of Neuma's claim that Wells Fargo failed to produce required documents.  Neuma's failure to disclose Fishman thus bars Neuma's use of his affidavit.

Moreover, Paragraphs 2 and 9 of the Fishman affidavit—the crucial sections, and the only paragraphs to which Neuma cites in its Local Rule 56.1 Statement—must be stricken in any event for lack of personal knowledge.  *See* FED. R. CIV. P. 56(e) ("affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence . . . .");  *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987) ("The use of affidavits by counsel . . . is a tactic fraught with peril, and counsel must remember that the requirements of Rule 56(e) are set out in mandatory terms and the failure to comply with those requirements makes the proposed evidence inadmissible during the consideration of the summary judgment motion.").  Neuma's claim that Fishman has personal knowledge of what documents Brodsky received by virtue of the fact that both Fishman and Brodsky were attorneys at the same law firm (Pl.'s Strike Mem., at 7) bears little

discussion; the fact that Fishman was another of the Aronberg firm's 38 attorneys provides no basis for any inference that Fishman was privy to Brodsky's correspondence in August 2000. Neuma lays no other foundation; indeed, the fact that the first indication of Fishman's involvement in this case appears in July 2003 provides the opposite inference.

The Fishman affidavit is stricken in its entirety.[17] With the Fishman affidavit stricken, the portions of Neuma's 56.1 statements that cite to the Fishman affidavit lack evidentiary support. (Pl.'s 56.1 ¶¶ 31–33; Pl.'s 56.1 Resp. ¶ 101.) Therefore, the court must disregard Neuma's challenge to Wells Fargo's assertion that Wells Fargo provided, on August 16, 2000, a copy of the "master Plan document" and a "summary plan description."

### 2. Further Communications Between the Parties

On November 30, 2000, attorney Paul A. Greenberg of the Aronberg firm sent a letter to Wells Fargo on behalf of Neuma, asserting that Wells Fargo had breached a fiduciary duty to Ockhuysen and/or Neuma by failing to inform Neuma that Wells Fargo's insurance carrier had changed from MetLife to Minnesota Life, and demanded that Ockhuysen's policy be reinstated to allow Neuma to exercise its conversion rights. (Def.'s 56.1 ¶ 102; Letter from Greenberg to Sheean of 11/30/2000, Ex. G to Sheean Aff., Ex. to Def.'s 56.1.) The letter did not request further documents, and did not state that the documents provided by Wells Fargo on August 16, 2000 were

---

[17]  Because Neuma's failure to disclose Fishman as a witness and Fishman's lack of personal knowledge of the matters he testifies to in Paragraphs 2 and 9 provide ample grounds for striking the Fishman affidavit, the court need not reach Wells Fargo's argument that Fishman violated the "Lawyer-Advocate Rule." *See* N.D. Ill. R. 83.53.7(a) ("A lawyer shall not act as an advocate in a trial or evidentiary proceeding if the lawyer knows or reasonably should know that the lawyer may be called as a witness therein on behalf of the client . . . ."). The court, however, notes with disappointment Neuma's attempt to evade application of the rule solely on grounds that Fishman is not designated as "trial counsel" in this case. (Pl.'s Strike Mem., at 5–6.) Fishman has signed many of the substantive documents submitted to the court—including the very memorandum filed by Neuma in response to Wells Fargo's motion to strike his affidavit. He has appeared before this court numerous times in this matter, and admits that he has "primary responsibility" for this action on behalf of Neuma. (Fishman Aff. ¶ 1, Ex. 5 to Pl.'s 56.1.) The policies embodied in the rule prohibiting an attorney from serving as both witness and advocate relate to the attorney's substantive role, not to mere terminology. *See* N.D. Ill. R. 83.53.7 cmt. ("Combining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between the lawyer and client. . . . A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others.").

in any way deficient. (Def.'s 56.1 ¶ 103.) On February 21, 2001, after apparently receiving no reply, the Aronberg firm sent a fax to Wells Fargo requesting a response to the November 30 letter, but again making no complaint about the sufficiency of the documents Wells Fargo provided on August 16, 2000. (Id. ¶ 104.) On February 28, 2001, Wells Fargo responded to the November 30, 2000 letter, denying that Wells Fargo had committed any breach of fiduciary duty and stating that it would return Neuma's premium payments for Ockhuysen's 1999 life insurance coverage.[18] (Id. ¶ 105.)

There was no further communication between the parties for nearly two and a half years. On July 24, 2003—nearly three years after Neuma's July 31, 2000 request for documents—attorney Howard Fishman of the Aronberg firm wrote to Neuma and, for the first time, claimed that Wells Fargo had failed to comply with that July 31, 2000 request. (Letter from Fishman to Sheean of 7/24/2003, Ex. J to Sheean Aff., Ex. to Def.'s 56.1.) Specifically, Fishman alleged that Wells Fargo had not produced its 1996 Benefits Book; should have provided the entire 1998 Benefits Book, rather than excerpts thereof; and should have provided documents regarding benefits under the Minnesota Life policy that became effective in July 1999. (Id.) Notably, Fishman did not allege in the July 24, 2003 letter that Wells Fargo had neglected to provide a "master plan document" or the actual group life policy. A second letter, also dated July 24, 2003, requested that Wells Fargo reconsider its "denial of benefits" and reinstate $139,000 of life insurance coverage on Ockhuysen. (Def.'s 56.1 ¶ 106; Letter from Fishman to Sheean, Ex. K to Sheean Aff., Ex. to Def.'s 56.1.)

On February 2, 2005, this court directed Wells Fargo to produce "all documents involving the MetLife Plan that relate to Ockhuysen and Neuma," as well as "complete copies of the 1998 Employee Benefits Book and 1996 Benefits Book." Order of 2/2/98. On or around March 3, 2005, Wells Fargo produced, inter alia, complete copies of the 1998 and 1996 Benefits Books. (Def.'s

---

[18]    The record does not indicate whether Wells Fargo followed through and refunded any of Neuma's premium payments. Neuma asserts that Wells Fargo did not, (Pl.'s 56.1 ¶ 26), but its citation to Heidrich's affidavit does not support this assertion. (Heidrich Aff. ¶ 13, Ex. 3 to Pl.'s 56.1.)

56.1 Resp. Addnl. ¶ 21.)

### G.    This Lawsuit

Neuma filed suit against Wells Fargo on June 23, 2004. On July 20, 2004, Plaintiff filed its First Amended Complaint for Declaratory Judgment and Other Relief (the "Complaint"). Count I of the Complaint alleges that Wells Fargo "breached its duties to Neuma under the Plan," and seeks a declaration of the parties' rights and duties under the Plan, including a declaration that Wells Fargo must pay Neuma $139,000 upon Ockhuysen's death. (First Am. Compl. ¶¶ 27–30.) In Count II, labeled "Recovery of Benefits Pursuant to ERISA § 502," Neuma asserts that Wells Fargo "violated its duties under the Plan" by (1) "improperly terminating . . . Neuma's coverage under the Plan"; (2) "failing to advise Neuma of the change in Ockhuysen's status"; and (3) accepting Neuma's premiums but failing to "maintain coverage." (*Id.* ¶¶ 32–34.) Neuma seeks an award of Ockhuysen's death benefits of $139,000, or, if Ockhuysen is still alive, an order requiring Wells Fargo to procure a life insurance policy on Ockhuysen's life in that face amount. (*Id.* ¶ 35.) Count III is a breach of fiduciary duty claim that seeks only damages; specifically, Neuma alleges that Wells Fargo owed fiduciary duties to Neuma as an assignee pursuant to 29 U.S.C. § 1104(a)(1), which it breached by failing to "maintain Ockhuysen's life insurance benefits as required by the Plan," and by failing to "inform Neuma of circumstances which could lead to the reduction or discontinuance of benefits under the Plan." (*Id.* ¶¶ 36–39.) Count IV charges Wells Fargo with failure to produce requested ERISA documents in violation of 29 U.S.C. § 1132(c), and seeks a statutory fine of $110 per day from either June 28, 2000, or July 31, 2000.[19] (*Id.* ¶¶ 42–46.)

On May 6, 2005, the parties filed cross-motions for summary judgment. Defendant Wells Fargo seeks summary judgment in its favor on all four counts asserted in the Complaint. (Defendant Wells Fargo & Company's Amended Motion for Summary Judgment, at 1.) Plaintiff

---

[19]      The Complaint states the statutory fine as $10 per day. (First Am. Compl. ¶ 46.) 29 U.S.C. 1132(c) provides for a fine of up to $100 per day, which has now been increased to $110 per day. 29 C.F.R. § 2575.502c-1. Accordingly, on September 9, 2004, this court acknowledged that Plaintiff's prayer for relief was amended to reflect a fine of $110 per day. Order of 9/9/04.

Neuma moves for summary judgment on Counts III and IV. (Plaintiff's Motion for Summary Judgment, at 1.) This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) (providing exclusive or concurrent federal court jurisdiction for ERISA claims).

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Alexander v. Wisconsin Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001). A genuine issue of material fact exists "only if there is sufficient evidence for a jury to return a verdict for that party." *Alexander*, 263 F.3d at 680 (citing *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999)). When presented with cross-motions for summary judgment, the court considers the motions simultaneously, and draws all reasonable inferences in favor of the party opposing a particular motion. *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir. 1993). This "Janus-like" perspective can result in the denial of both motions if material facts are disputed. *Id.* The Seventh Circuit has observed, in another case involving this plaintiff (and elsewhere), that "[c]ases involving the interpretation of contractual documents are particularly well-suited to disposition on summary judgment." *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 871 (7th Cir. 2001).

### II.  Construction of Neuma's Claims for Recovery of Benefits and Breach of Fiduciary Duty

As an initial matter, the court attempts to discern precisely what relief Neuma seeks in Counts II and III and under what statutory provision Neuma proceeds in those counts. Neuma styles Count II as a claim for "Recovery of Benefits Pursuant to ERISA § 502," (Am. Compl. ¶ 31), and Count III as a claim breach of fiduciary duty under ERISA, (*Id.* ¶ 36), without specifying which subsections of section 502 it charges Wells Fargo with violating. Section 502 provides various

avenues for bringing a civil action. *See* 29 U.S.C. § 1132(a). Claims for recovery of benefits are typically brought pursuant to 29 U.S.C. § 1132(a)(1)(B), which allows an ERISA plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see, e.g., Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 574 (7th Cir. 2006). Claims for breach of fiduciary duty can be brought by the ERISA plan as a whole under 29 U.S.C. § 1132(a)(2), or by an individual beneficiary under 29 U.S.C. § 1132(a)(3). *See Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 992–93 (7th Cir. 1993). Specifically, § 1132(a)(3 authorizes an ERISA beneficiary to sue "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations." 29 U.S.C. § 1132(a)(3); *Anweiler*, 3 F.3d at 992–93.

Claims under ERISA for breach of fiduciary duty are, however, limited in two major ways. First, a plaintiff cannot recover compensatory damages or monetary relief for a claim of breach of fiduciary duty under § 1132(a)(3). *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 255–59 (1993); *Anweiler*, 3 F.3d at 993. Second, a plaintiff cannot proceed under § 1132(a)(3) if it can state a claim for recovery of benefits under § 1132(a)(1)(B). *Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084, 1088 (11th Cir. 2000) (affirming district court's grant of summary judgment and conclusion that "an ERISA plaintiff with an adequate remedy under § 1132(a)(1)(B), cannot alternatively plead and proceed under § 1132(a)(3)"); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998) ("Because [the plaintiff] has adequate redress for disavowed claims through his right to bring suit pursuant to section 1132(a)(1), he has no claim for breach of fiduciary duty under section 1132(a)(3)."); *Clark v. Hewitt Assoc., LLC*, 294 F. Supp. 2d 946, 950 (N.D. Ill. 2003) ("Defendants further argue that plaintiff may not avail herself of relief under § 1132(a)(3) because she has the right to seek relief under § 1132(a)(1)(B). We agree."); *cf. Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (explaining that § 1132(a)(3) is a "catchall provision" that offers "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy"

but allowing the plaintiffs to proceed after determining that they could not recover benefits under § 1132(a)(1)(B)).

Both limitations are implicated here. First, Plaintiff's claim for breach of fiduciary duty in Count III seeks monetary, not equitable relief. Neuma asks for "damages, in an amount to be proven at trial . . . attorneys fees and costs . . . prejudgment and post-judgment interest . . . [and] such other and further relief as the Court deems just and appropriate." (First Am. Compl. ¶ 39.) Nowhere in Count III does Neuma seek injunctive or any other equitable relief; thus, Count III cannot be maintained as a claim for breach of fiduciary duty under § 1132(a)(3). *See Anweiler*, 3 F.3d at 993. Second, if Neuma's self-styled claim for "Recovery of Benefits" is brought under § 1132(a)(1)(B), that claim may preclude any claim for breach of fiduciary duty under section 1132(a)(3). *See Clark*, 294 F. Supp. 2d at 950. Neuma appears to recognize the latter difficulty. In its brief in response to Defendant's motion for summary judgment, Neuma flatly states "Neuma cannot obtain relief under ERISA Section 502(a)(1)(B)." (Neuma, Inc.'s Response to Defendant's Motion for Summary Judgment (hereinafter, "Pl.'s Resp."), at 3.) If that is the case, however, Neuma may be left with nothing. If Neuma's claim for breach of fiduciary duty in Count III is barred as a matter of law because it seeks only monetary relief, and if Count II is (as Neuma identifies it in the Complaint) a claim for recovery of benefits–a claim that Neuma itself admits is unsustainable under § 1132(a)(1)(B)--then Neuma has no viable claims in Count II or Count III.

Neuma appears to suggest a way around this: interpreting Count II, not Count III, as stating a claim for breach of fiduciary duty. Thus, Neuma contends that its claim for fiduciary duty seeks "appropriate equitable relief" under § 1132(a)(3) because it seeks an order requiring Wells Fargo to reinstate or otherwise procure a new life insurance policy on Ockhuysen's life. (Pl.'s Resp., at 2.) In fact, this prayer for relief appears in the Complaint *not* under Count III, Neuma's self-identified claim for breach of fiduciary duty, but under Count II, its claim for "recovery of benefits." (First Am. Compl. ¶ 35.) In any event, regardless of how it is labeled, Neuma's Count II charges Wells Fargo with having "violated its duties under the Plan." (*Id.* ¶¶ 32–34.) Moreover, complaints

must be construed favorably to their drafters, *see North Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 444 (7th Cir. 1996), and Rule 8(f) of the Federal Rules of Civil Procedure provides that "[a]ll pleadings shall be so construed as to do substantial justice." FED. R. CIV. P. 8(f); *cf. Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) (internal quotations and citations omitted) ("The liberal construction accorded a pleading under Rule 8(f) does not require the courts to fabricate a claim that a plaintiff has not spelled out in his pleadings."). The court thus proceeds under the assumption that Neuma in Count II asserts a claim for breach of fiduciary duty, seeking equitable relief, pursuant to § 1132(a)(3).

This is not to say that Neuma in Count II does not also assert a claim for recovery of benefits under § 1132(a)(1)(B). Despite Neuma's current assertion, noted above, that it cannot state a § 1132(a)(1)(B) claim, a literal reading of the Complaint shows that Neuma has indeed done so. Indeed, it would be difficult to interpret "Recovery of Benefits Pursuant to ERISA § 502" any other way.[20] (First Am. Compl. ¶ 31.) Nor does it appear that Neuma has entirely abandoned such a claim: in its brief in support of its summary judgment motion, Neuma states, while discussing its information request claim under 29 U.S.C. § 1132(c), that "Neuma should prevail on the merits of its claim for benefits." (Neuma's Amended Memorandum of Law in Support of its Motion for Summary Judgment (hereinafter, "Pl.'s Mem."), at 14.) Neuma's assertion of, or ability to state a claim under § 1132(a)(1)(B, is significant for two reasons. First, as noted, Neuma may be barred from proceeding under § 1132(a)(3) if it can proceed under § 1132(a)(1)(B). *See Clark*, 294 F. Supp. 2d at 950; *cf. Varity*, 516 U.S. at 512. Second, to maintain its § 1132(c) information request claim, Neuma must be able to show that at the time it filed suit, it had a "colorable claim" for benefits, which the Seventh Circuit has explained means an "arguable" or non-frivolous claim. *See*

---

[20]     Wells Fargo in its briefs presumes that Neuma brings Count II as a claim for recovery of benefits pursuant to § 1132(a)(1)(B). (Memorandum of Law in Support of Defendant Wells Fargo & Company's Motion for Summary Judgment (hereinafter, "Def.'s Mem."), at 4 n.6.) Neuma neither adopts nor refutes that presumption; rather, Plaintiff avoids the issue, stating: "The relevant question is not whether Neuma has asserted a claim under ERISA Section 502(a)(1)(B) . . . . [but] whether Neuma has sought equitable relief [which is] appropriate under the circumstances." (Pl.'s Resp., at 1.)

*Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 878 (7th Cir. 2001) ("*AMP*") (Neuma, in litigation unrelated to this case, stated a colorable claim for recovery of benefits that allowed it to proceed under § 1132(c), even though the court affirmed summary judgment for the defendant on Neuma's § 1132(a)(1)(B) claim). In other words, Neuma cannot proceed here under § 1132(c) unless it states a "colorable claim" for recovery of benefits, *see id.*; however, if it can state a claim for recovery of benefits under § 1132(a)(1)(B), that may bar its ability to proceed under § 1132(a)(3) for breach of fiduciary duty. *See Clark*, 294 F. Supp. 2d at 950. The court addresses the significance of these procedural issues in its analysis of Neuma's claims. For now, the court merely concludes that Neuma has in Count II asserted claims both for recovery of benefits pursuant to § 1132(a)(1)(B), and for breach of fiduciary duty pursuant to § 1132(a)(3).

Accordingly, because Count III—which cannot be construed as anything but a claim for breach of fiduciary duty—seeks only monetary relief, the court grants summary judgment for Wells Fargo for Count III, and denies summary judgment for Neuma. To the extent that Count II asserts a claim for breach of fiduciary duty, the court considers Neuma to have moved for summary judgment on that count as well. The court proceeds with its analysis of Wells Fargo's motion for summary judgment on Neuma's claims for recovery of benefits pursuant to § 1132(a)(1)(B) and for declaratory relief (Counts I and II); the parties' cross-motions for summary judgment on Neuma's breach of fiduciary duty claim pursuant to § 1132(a)(3) (now, also Count II); and the parties' cross-motions for summary judgment on Neuma's § 1132(c) claim for deficient production of documents (Count IV).

### III.     Recovery of Benefits Pursuant to Section 1132(a)(1)(B)

As noted, Neuma has asserted a claim for recovery of benefits under § 1132(a)(1)(B). To prevent its breach of fiduciary duty claim from being barred by a viable recovery-of-benefits claim, however, Neuma now purports to be unable to maintain a § 1132(a)(1)(B) claim, (Pl.'s Resp., at 3), and offers no argument in support of it. Neuma asserts that it "cannot obtain relief under ERISA Section 502(a)(1)(B)" and that it "cannot recover 'benefits due' under section 1132(a)(1)(B) for

obvious reasons." (*Id.* at 3, 5.) Defendant argues that Neuma has thereby waived its right to oppose summary judgment. (Defendant Wells Fargo & Company's Reply to Neuma, Inc.'s Response to Defendant's Motion for Summary Judgment (hereinafter, "Def.'s Reply"), at 3–4.) The court agrees. Neuma fails to articulate any reason why the court should not grant Wells Fargo summary judgment as a matter of law on Neuma's § 1132(a)(1)(B) claim, offers no response to any of Wells Fargo's arguments as to why the claim is insufficient, and even goes so far as to affirmatively deny its ability to prevail on the claim. The court thus grants summary judgment for Wells Fargo on Neuma's claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B). *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) ("Bombard abandoned his FMLA claim after failing to respond to the FMLA arguments in [defendant's] motion for summary judgment."); *Kowalczyk v. Walgreen Co.*, No. 03 C 8335, 2005 WL 1176599, at *11 (N.D. Ill. May 17, 2005) (granting summary judgment on an ADA claim after finding that plaintiff abandoned the claim by failing to respond to defendant's argument).

Because Neuma's ability to maintain its § 1132(c) and § 1132(a)(3) claims depends in part on its ability to state a colorable § 1132(a)(1)(B) claim, however, the court examines Neuma's recovery of benefits claim more closely. The parties offer different reasons as to why the claim fails: Neuma appears to argue that it lacks standing, (Pl.'s Resp., at 5), while Wells Fargo argues that the claim fails on its merits as a matter of law. (Def.'s Mem., at 5.) The court concludes that both defenses defeat any § 1132(a)(1)(B) claim here.

Only a "participant" in an ERISA plan or a "beneficiary" has standing to bring a claim under § 1132(a)(1)(B). *See Kennedy v. Connecticut Gen. Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir. 1991). A "participant" is "any employee or former employee . . . who is or may become eligible to receive a benefit" from an ERISA plan. 29 U.S.C. § 1002(7). A "beneficiary" is "a person designated by a participant . . . who is or may become entitled to a benefit" under the plan. 29 U.S.C. § 1002(8). The assignee of a beneficiary (such as Neuma here) stands in the shoes of the beneficiary. *Kennedy*, 924 F.2d at 700 (citing *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d

1374 (9th Cir. 1986)). Neuma nevertheless observes that it lacks standing to pursue a recovery-of-benefits claim for two reasons: first, because Neuma is "no longer a member of the Plan" and did not convert Ockhuysen's policy to an individual policy, it is "not qualified to receive life insurance benefits"; second, because Ockhuysen is still alive (as of August 2005), no benefits would be due to Neuma even if it had converted the policy. (Pl.'s Resp., at 5.) Neuma's second argument requires little discussion. Section 1132(a)(1)(B) expressly allows a participant or beneficiary to bring an action to "clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see Sladek v. Bell Sys. Mgmt. Pension Plan*, 880 F.2d 972, 976 (7th Cir. 1989). Thus, as long as Neuma is a participant or beneficiary, it has standing even if benefits are not presently due. With respect to Neuma's first argument–that it is "no longer" a member of the Plan–the court notes that Neuma never was a "participant" in the Plan in the first place; rather, Ockhuysen was the participant, and Neuma was the beneficiary as his assignee. Thus, Neuma's standing does not depend on whether Neuma was a "member" or "participant" in the Plan, but on whether Neuma qualifies as a "beneficiary."

As noted, ERISA defines a "beneficiary" as "a person designated by a participant . . . who is or may become entitled to a benefit" under the plan. 29 U.S.C. § 1002(8). The Seventh Circuit interprets the term "beneficiary" broadly for standing purposes. *Sladek*, 880 F.2d at 976. A party is considered a beneficiary "if it can show that at the time it filed suit it had a colorable claim to vested benefits." *AMP*, 259 F.3d at 878. The test for a colorable claim "is not a stringent one." *Id.* (quoting *Panaras v. Liquid Carbonic Indus. Corp*, 74 F.3d 786, 790 (7th Cir. 1996)). Rather, a plaintiff has standing as a beneficiary if she has "even an 'arguable' claim" to recover benefits. *Id.* (quoting *Kennedy*, 924 F.2d at 700). An assignee fails to qualify as a beneficiary "'[o]nly if the language of the plan is so clear that any claim as an assignee must be frivolous . . . .'" *Id.* (quoting *Kennedy*, 924 F.2d at 700).

As noted, Neuma is in an awkward position, and one that forces Neuma to argue against its own § 1132(a)(1)(B) claim in order to assert its right to recover for a breach of fiduciary duty

under § 1132(a)(3). (Pl.'s Resp., at 5.) At the same time, however, Neuma forcefully argues that it has a colorable claim to benefits that gives Neuma standing to pursue its § 1132(c) claim for failure to produce documents. (Pl.'s Mem., at 13–14.) But the test for whether a party has standing under § 1132(a)(1)(B) and under § 1132 (c) is identical: whether the party can state a colorable claim to benefits. *See AMP*, 259 F.3d at 878; *Panaras*, 74 F.3d at 790. If Neuma has a colorable claim for recovery of benefits, its argument that it lacks standing to assert a § 1132(a)(1)(B) necessarily fails; and vice-versa.

Neuma is no stranger to these issues. In *AMP*, Neuma asserted claims both for recovery of benefits under § 1132(a)(1)(B) and for failure to produce documents under § 1132(c) under facts similar to those here. In that case, Neuma entered into a viatical agreement with AMP employee Larsen while Larsen was on disability leave. 259 F.3d at 868. Under Larsen's life insurance plan, AMP would continue to pay premiums for disabled employees under the age of 60; however, the plan provided that the insurance would cease upon termination of the plan. *Id.* Shortly after entering into the viatical agreement with Neuma, AMP terminated Larsen, and shortly after that, AMP switched insurance carriers, terminating the life insurance plan and thus Larsen's benefits. *Id.* at 868–69. Several months later, Neuma requested plan documents from AMP, a request to which AMP did not respond until well after Neuma filed suit. *Id.* at 869. The Seventh Circuit affirmed summary judgment for AMP on Neuma's recovery of benefits claim, concluding that the express terms of the plan documents permitted AMP to stop paying premiums when it switched carriers. *Id.* at 877.

As to the production of documents claim, however, the Seventh Circuit reversed the district court's holding that Neuma was not a beneficiary and thus lacked standing to proceed under § 1132(c). The court noted the "minimal standard" that Neuma needed to meet to establish that it had a colorable claim to benefits, and explained that Neuma's argument that the plan documents required AMP to keep paying Larsen's premiums was "not so bizarre or so out of line with existing precedent that Neuma has failed to meet the low threshold of the colorable requirement." *Id.* at 879

(internal quotations and citations omitted). Neuma had standing as a beneficiary because its claim for recovery of benefits "had at least an arguable chance of success" and was "not so obviously lacking in any legal merit as to be characterized as frivolous." *Id.*

Notwithstanding its disavowal of its § 1132(a)(1)(B) claim, Neuma asks this court to follow the Seventh Circuit's *AMP* decision and find that Neuma nonetheless has asserted a colorable claim to benefits. (Pl.'s Mem., at 13–14.) The court declines to do so. First, although the court acknowledges the low threshold of the colorable claim requirement, there are key differences between *AMP* and the present action. Unlike in *AMP*, Neuma here asserts no argument whatsoever in support of its § 1132(a)(1)(B) claim. In *AMP*, Neuma at least argued that the plan documents required the employer to maintain coverage; in this case, Neuma does not contend that the Plan did not allow Wells Fargo to terminate Ockhuysen's group policy. Neuma does not dispute that the Plan provided that an employee's group life benefits would end on the last day of the month in which employment ended; that Ockhuysen's life insurance benefits under the Plan terminated in accordance with this provision on December 31, 1998; that the Plan allowed for conversion to an individual policy only during the subsequent 31-day conversion period; or that Neuma failed to timely convert the policy. Indeed, Neuma admits that it "is not qualified to receive life insurance benefits." (Pl.'s Resp., at 5.) Thus, Neuma does not, as it did in *AMP*, present a non-frivolous argument that it is entitled to benefits; rather, it offers no argument at all. Second, given that the Seventh Circuit in *AMP* affirmed summary judgment for the defendant on a recovery of benefits claim on facts similar to those here, it is that much more difficult for Neuma to characterize its recovery of benefits claim in this case as "colorable." Finally, and perhaps most importantly, Neuma, as noted, forcefully argues that it lacks standing to pursue a claim for recovery of benefits. (Pl.'s Resp., at 5.) Neuma cannot have it both ways: if it for such "obvious reasons" lacks standing to pursue a claim, (*id.*), then that claim likely cannot be colorable.

The court concludes that Neuma has no colorable claim for recovery of benefits, and thus lacks standing to pursue its claim under § 1132(a)(1)(B). Although it need not reach the issue, the

court notes that Wells Fargo's argument that Neuma's claim fails on its merits as a matter of law has traction as well. Where the terms of an employee benefit plan afford the plan administrator broad discretion to interpret the plan and determine benefit eligibility, the appropriate judicial standard of review of a denial of benefits is the deferential "arbitrary and capricious" standard. *See Davis*, 444 F.3d at 575. This standard applies here because it is undisputed that Wells Fargo, as plan administrator, had "full discretionary authority to administer and interpret" the Plan. (Def.'s 56.1 ¶ 31.) Under this standard, a court will uphold an administrator's denial of benefits "so long as that decision has 'rational support in the record.'" *Davis*, 444 F.3d at 576 (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)). A court will not overturn an administrator's decision unless it is "downright unreasonable." *Id.* (internal quotations and citations omitted).

Here, Wells Fargo denied Neuma's demand that Wells Fargo reinstate Ockhuysen's policy because, as noted, the Plan provided that upon an employee's termination, the policy would lapse if not converted to an individual policy within 31 days after the last day of the month of termination of employment. Neuma failed to convert the policy. Because Wells Fargo's decision not to reinstate the policy was thus authorized by the express terms of the Plan, Wells Fargo's denial of benefits was neither arbitrary, capricious, nor unreasonable.

## IV.    Breach of Fiduciary Duty Pursuant to Section 1132(a)(3)

To state a claim for breach of fiduciary duty under ERISA, a plaintiff must establish: (1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duties; and (3) that the breach caused harm to the plaintiff.[21] *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 465 (7th Cir. 2005) (citing *Kamler v. H/N Telecomm. Serv., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002)). The parties do not dispute that Wells Fargo was a fiduciary under the Plan, and owed fiduciary duties to Neuma as assignee of Ockhuysen's life benefits while the Policy was in effect. Nor do the

---

[21]    Although the court has concluded that Neuma lacks standing to pursue a claim for recovery of benefits under § 1132(a)(1)(B), Neuma may nevertheless have standing to pursue a claim for breach of fiduciary duty under § 1132(a)(3). A plaintiff can assert a claim for breach of fiduciary duty despite a lack of standing under § 1132(a)(1)(B). *Clair v. Harris Trust and Sav. Bank*, 190 F.3d 495, 497–98 (7th Cir. 1999).

parties dispute that Neuma has suffered financial harm. Rather, the parties dispute the extent of Wells Fargo's fiduciary duties under the Plan. Neuma contends that in November 1998, when Neuma Chief Financial Officer Heidrich called Wells Fargo's Fickett to verify Ockhuysen's employment status, Wells Fargo had an affirmative obligation to inform Neuma that Ockhuysen's employment was scheduled to terminate on December 16, 1998. (Pl.'s Mem., at 11; Pl.'s Resp., at 10.) Wells Fargo disputes that its fiduciary duties extend so far, (Def.'s Mem., at 10–12; Def.'s Resp., at 10), but further argues that two procedural impediments bar Neuma from even asserting its claim: first, that Neuma cannot assert a claim for breach of fiduciary duty under § 1132(a)(3) where relief is available under § 1132(a)(1)(B); and second, that Neuma's claim is barred by the statute of limitations set forth in 29 U.S.C. § 1113.[22] (Def.'s Mem., at 7–8.)

Defendant's first procedural argument need not detain the court. As discussed above, Neuma has no colorable claim for recovery of benefits and thus lacks standing to assert a claim under § 1132(a)(1)(B). Defendant's second procedural argument, however, requires greater analysis. ERISA's statute of limitations provides that no claim for breach of fiduciary duty may be brought after the earlier of

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113. Defendant contends that the three-year "actual knowledge" provision of § 1113 applies. (Def.'s Mem., at 8.) Defendant argues that when Neuma learned of the termination of

---

[22]     Wells Fargo also urges the court to find Neuma's breach of fiduciary duty claim barred because Count III, the claim Neuma labels as its breach of fiduciary claim, seeks money damages rather than equitable relief. (Def.'s Reply, at 6.) The court has addressed this concern by construing Count II to state a claim for breach of fiduciary duty as well, and in Count II, Neuma seeks equitable relief in the form of an order requiring Wells Fargo to procure life insurance on Ockhuysen. *See supra* Part II.

Ockhuysen's employment and life insurance benefits on March 2, 2000, Neuma had "actual knowledge" of Wells Fargo's purported breach of its fiduciary duty in failing to have informed Neuma of those events before Neuma's ability to convert the policy lapsed. (*Id.*) Because Neuma filed suit on June 23, 2004, more than four years later, Defendant maintains that the three-year statute of limitations bars Neuma's claim.

Plaintiff as an initial matter argues that Wells Fargo waived its statute of limitations defense by failing to assert it in its answer to the Complaint. (Pl.'s Resp., at 6.) Plaintiff correctly observes that "Federal Rule of Civil Procedure 8(c) requires a defendant to plead a statute of limitations defense and any other affirmative defense in his answer to the complaint." *Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997); *see* FED. R. CIV. P. 8(c). Generally, a defendant's failure to plead an affirmative defense results in a waiver of that defense. *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir. 1987) (citing *Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 (7th Cir. 1981)). This is not, however, the bright-line rule that Plaintiff argues it should be. *See Bobbitt v. Victorian House, Inc.*, 532 F. Supp. 734, 736 (N.D. Ill. 1982) ("In the real world . . . failure to plead an affirmative defense will rarely result in waiver."). The Seventh Circuit has repeatedly held that "delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result." *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (per curiam) (citing *Williams v. Lampe*, 399 F.3d 867, 870–71 (7th Cir. 2005) (per curiam); *Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003)). A plaintiff "cannot establish prejudice merely by showing that the case has progressed significantly since the defendants answered his complaint." *Williams*, 399 F.3d at 871. Thus, where the plaintiff has a chance to respond to a later-asserted affirmative defense and argue the defense in the district court, "technical failure to plead the defense is not fatal." *DeValk*, 811 F.2d at 334; *see Curtis*, 436 F.3d at 711 (finding no waiver where defendant raised a failure-to-exhaust defense for the first time on summary judgment, but plaintiff was able to confront the defense in its response to defendant's motion for summary judgment); *Blaney v. United States*, 34 F.3d 509, 512 (7th Cir. 1994) (rejecting

plaintiff's argument that defendants waived a statute of limitations defense by raising it for the first time in their motion to dismiss); *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 928 (7th Cir. 1991) (noting that while defendant's Statute of Frauds defense "technically" should have been raised in its answer rather than its motion for judgment on the pleadings, the defense was not waived where plaintiff was allowed to respond in an additional memorandum); *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797–98 (11th Cir. 1989) (finding no waiver where defendant raised its statute of limitations defense in a motion for summary judgment filed one month before trial). Moreover, while the "appropriate manner" of raising an affirmative defense not asserted in the pleadings is to seek leave to amend the answer, *see Venters*, 123 F.3d at 968, "such formality can be excused when the issue is otherwise adequately raised." *Stupak v. Hoffman-La Roche, Inc.*, 315 F. Supp. 2d 970, 973 (E.D. Wis. 2004).

Plaintiff relies heavily on the Seventh Circuit's *Venters* decision. In *Venters*, the district court allowed the defendants to assert a statute of limitations defense for the first time in their reply memorandum in support of their motion for summary judgment. 123 F.3d at 968. The reply was filed a month before the scheduled trial date, and on the eve of oral argument before the district court; in fact, plaintiff's counsel did not receive a copy until the morning of oral argument and read it while traveling to the courthouse. *Id.* The Seventh Circuit reversed, holding that the plaintiff was prejudiced—in the court's words, she had been "bushwacked"—and the limitations defense waived, because the defendants had "deprived [plaintiff] of any reasonable opportunity to address that defense." *Id.*; *see Williams*, 399 F.3d at 871 (explaining that the court reversed in *Venters* because defendants raised the limitations defense "at the eleventh hour" and gave the plaintiff "almost no time to respond.").

Neuma has not been victimized by any such eleventh-hour surprise here. Although it may have been preferable for Wells Fargo to have asserted its statute of limitations defense in its answer, its failure to do so has not prejudiced Neuma. Wells Fargo did not, as in *Venters*, assert the defense in its reply brief without giving Neuma an opportunity to respond; rather, Wells Fargo

asserted the limitations defense in its motion for summary judgment and Neuma has devoted several pages of its response to urging the court to reject it. (Pl.'s Resp., at 6–9.)  In fact, Neuma's only assertion of prejudice from Wells Fargo's delay in asserting the limitations defense is that it has had "[no] opportunity to conduct discovery on this issue." (*Id.* at 8.)  Neuma has not explained what discovery of Wells Fargo's witnesses and/or documents would enable Neuma to more competently respond to the charge that it waited too long to bring suit; as Defendant points out, any discoverable information regarding when Neuma obtained "actual knowledge" of Wells Fargo's alleged breach of duty resides entirely within Neuma's own witnesses and documents.  Accordingly, because Neuma has not been prejudiced and has had ample opportunity to respond, the court concludes that Wells Fargo has not waived its statute of limitations defense by raising it for the first time in its motion for summary judgment rather than in its answer.

To possess "actual knowledge" of a breach or violation, thus triggering the three-year statute of limitations under § 1113(2), "a plaintiff must know of the essential facts of the transaction or conduct constituting the violation." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992).  Actual knowledge does not mean "knowledge of every last detail of a transaction, or knowledge of its illegality." *Rush v. Martin Petersen Co.*, 83 F.3d 894, 896 (7th Cir. 1996) (quoting *Martin*, 966 F.2d at 1086).  It is not enough, however, that the plaintiff "had notice that something was awry." *Martin*, 966 F.2d at 1086 (quoting *Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1221 (7th Cir. 1990)).  The requisite knowledge thus lies "somewhere between 'every last detail' and 'something was awry.'" *Id.*  In determining whether a plaintiff possessed such knowledge, a court considers "the complexity of the underlying factual transaction, the complexity of the legal claim and the egregiousness of the alleged violation."[23] *Id.*

---

[23]    The court acknowledges that some courts outside the Seventh Circuit adopt a stricter standard for "actual knowledge"; namely, that § 1113(2) requires a plaintiff to have actual knowledge not merely of the facts underlying a claim, but that the defendant violated the law.  The Third Circuit, for instance, "requires a showing that plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim for breach of fiduciary duty or violation under ERISA." *Int'l Union v. Murata Erie North Am., Inc.*,

(continued...)

In this case, neither Neuma's claim nor the facts giving rise to it are particularly complex. Neuma's claim rests on the theory that Wells Fargo breached its fiduciary duty by "providing incomplete and misleading information to Neuma." (Pl.'s Mem., at 10–11.)  At the heart of Neuma's claim is the November 16, 1998 conversation between Neuma Chief Financial Officer Heidrich and Wells Fargo's Fickett.  Neuma contends that because Fickett told Heidrich only that Ockhuysen was employed, without informing him that Ockhuysen's employment was scheduled to terminate on December 16, 1998 after Ockhuysen exhausted his disability leave, and because Fickett further advised Heidrich to pay Ockhuysen's 1999 premiums in advance in a lump sum payment, "Neuma could draw but one conclusion—that [Ockhuysen] would remain in Wells Fargo's employ, and that the coverage on the Policy would remain intact, through at least 1999."  (Pl.'s Resp., at 10.)  Ignorant of Ockhuysen's termination, Neuma lost its opportunity to convert his group life policy to an individual policy before the end of the 31-day conversion period following the end of Ockhuysen's benefits.

When Fickett spoke to Heidrich on March 2, 2000, after Heidrich had inquired as to why Neuma's check for Ockhuysen's 2000 premiums had not cleared, it is undisputed that Heidrich learned the following: that Ockhuysen's employment had ended in December 1998; that Ockhuysen's group life insurance coverage had terminated on December 31, 1998; and that because Neuma had not converted Ockhuysen's group policy to an individual policy within the

---

[23](...continued)
980 F.2d 889, 900 (3rd Cir. 1992).  Courts in other circuits, however, including the Sixth, Ninth, and Eleventh Circuits, follow the Seventh Circuit in holding that knowledge of the essential facts is sufficient, and that a defendant need not show that the plaintiff had actual knowledge that those facts state a cognizable legal claim.  *See Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003) (expressly choosing the Seventh Circuit approach over the Third Circuit approach and holding that "the relevant knowledge required to trigger the statute of limitations under 29 U.S.C. § 1113(2) is knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute."); *Blanton v. Anzalone*, 760 F.2d 989, 992 (9th Cir. 1985) ("The statute of limitations is triggered by . . . knowledge of the transaction that constituted the alleged violation, not by . . . knowledge of the law."); *Scott v. Evins*, 802 F. Supp. 411, 416 (N.D. Ala.1992), *aff'd*, 998 F.2d 1022 (11th Cir. 1993) (explaining that "actual knowledge" under § 1113(2) means "actual knowledge of the facts, not knowledge of the violation of the law").

conversion period, Neuma had forfeited its coverage under the policy. (Pl.'s 56.1 ¶ 28; Def.'s 56.1 ¶ 91; Heidrich Dep., at 28:8–16.) As noted, Neuma's claim rests entirely on the theory that Fickett should have told Heidrich in November 1998 of Ockhuysen's impending termination and resulting loss of benefits in December 1998, or that Wells Fargo in any event should have informed Neuma at some point before the conversion period ended. As of March 2, 2000, then, Neuma knew that Wells Fargo had terminated Ockhuysen and that Wells Fargo had never informed Neuma of this fact. Neuma had thus learned the "essential facts" underlying its claim for breach of fiduciary duty. The conversation between Heidrich and Fickett provided Neuma with actual knowledge of every fact it needed to assert its claim for breach of fiduciary duty, and indeed of every fact it now asserts in support of that claim.

Neuma downplays the extent of what Heidrich learned on March 2, 2000, contending that the conversation with Fickett merely provided Neuma with "notice that something was awry . . . i.e., that the Policy had lapsed for non-payment," and that "[t]he Policy could have lapsed for a variety of reasons wholly unrelated to Wells Fargo." (Pl.'s Resp., at 8.) Citing *Montgomery v. Aetna Plywood, Inc.*, 956 F. Supp. 781, 785 (N.D. Ill. 1997), Neuma claims that this does not amount to "actual knowledge." *See id.* (citing *Rush*, 83 F.3d at 896) ("Constructive knowledge or suspicion is an insufficient basis for invoking § 1113(2); there must be 'actual knowledge.'"). This simply misstates the facts. Fickett did *not* tell Heidrich that the Policy had lapsed for non-payment; rather, it is undisputed that she told Heidrich that the Policy lapsed because Ockhuysen had been terminated and Neuma had failed to convert the Policy. Far from having to speculate about what caused the Policy to lapse, Neuma learned the precise reason why. Neuma's claim is based on that very reason.

*Montgomery* is thus distinguishable. There, plaintiffs brought a breach of fiduciary duty claim against trustees of Aetna's Employee Stock Ownership Plan ("ESOP") for allowing Aetna to buy back its stock from the ESOP for an allegedly undervalued price. *Montgomery,* 956 F. Supp at 783. The trustees charged the plaintiffs with actual knowledge of the alleged breach based on

a letter the trustees sent to the ESOP participants, more than three years before the plaintiffs filed suit, in which the trustees stated they were "considering" engaging in the buyback. *Id.* at 784. The court found the letter insufficient to establish the plaintiff's actual knowledge of events allegedly constituting wrongdoing, noting that the letter gave no indication that the trustees had approved the transaction or of the purchase price considered. *Id.* at 786. In the case before this court, by contrast, Heidrich's March 2, 2000 conversation with Fickett, provided Neuma with knowledge not of an anticipated and uncertain future possibility, but of a completed series of events. Ockhuysen had been terminated; his coverage had lapsed; and Neuma had lost its chance to convert the Policy. Neuma thus learned all the facts it needed to support its claim. Indeed, Neuma identifies no occurrence after March 2, 2000 in which it obtained any additional knowledge that could support its claim.

This case is more like the Seventh Circuit's decision in *Rush*, in which the plaintiff, the retired office manager of a small company, alleged that his employer breached its fiduciary duty by failing to provide him with pension benefits. 83 F.3d at 895. The company had made contributions to a union pension fund on the plaintiff's behalf, but ceased doing so and received a refund of the contributions when the fund determined that the plaintiff was ineligible as a non-union worker. *Id.* The Seventh Circuit affirmed the district court's holding that the claim was barred by § 1113(2) because the plaintiff acquired "actual knowledge" that contributions were no longer being made on his behalf five years before filing suit. *Id.* at 896. Specifically, the court found the actual knowledge requirement satisfied by two pieces of evidence: first, that the plaintiff, himself the office manager who calculated the company's monthly payments to the pension fund, must have known that he was no longer receiving contributions; and second, the plaintiff received a letter informing him he was no longer eligible to participate in the fund. *Id.* This was sufficient, according to the Seventh Circuit, to provide the plaintiff with "actual knowledge of the essential facts giving rise to the alleged violation." *Id. See also Edes v. Verizon Communications, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (plaintiffs, temporary workers alleging that GTE breached a fiduciary duty by failing to classify them

as ERISA-eligible, had actual knowledge of GTE's alleged violation when they discovered that GTE had not classified them as employees on its direct payroll and plaintiffs were not receiving any ERISA benefits).

In reaching its conclusion on the limitations period, the court recognizes that Neuma initially charged Wells Fargo on November 30, 2000, with breaching its fiduciary duty not by failing to inform Neuma of Ockhuysen's termination, but by neglecting to advise Neuma that it had switched insurance carriers. (Def.'s 56.1 ¶ 102; Letter from Greenberg to Sheean of 11/30/2000, Ex. G to Sheean Aff., Ex. to Def.'s 56.1.) This would suggest that Neuma did not believe, eight months earlier in March 2000, that Wells Fargo had breached its duty by not informing Neuma of Ockhuysen's termination; rather, Neuma had a different conception of Wells Fargo's breach. As noted, however, a potential plaintiff's relevant knowledge for purposes of § 1113(2) is of facts, not of the alleged illegality of the defendant's conduct. *Rush*, 83 F.3d at 896 (citing *Martin*, 966 F.2d at 1086); *see also Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003) ("the relevant knowledge required to trigger the statute of limitations under 29 U.S.C. § 1113(2) is knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim . . . ."). Thus, even if Neuma did not believe in March 2000 that Wells Fargo's failure to inform Neuma of Ockhuysen's change in employment status was a breach of duty, Neuma had all the relevant facts at its disposal to formulate the claim it now asserts, as well as the arguments it now raises in support of that claim. *See Edes*, 417 F.3d at 142 (citing *Martin*, 966 F.2d at 1086 n.7) ("we do not think Congress intended the actual knowledge requirement to excuse willful blindness by a plaintiff.").

The court concludes that Neuma's breach of fiduciary duty claim is barred as untimely. Having reaches this conclusion, the court need not reach the merits of the claim, but observes that Wells Fargo would be entitled to summary judgment on this basis as well. Under ERISA, a fiduciary must "discharge his interests with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Fiduciaries breach this duty "if they mislead plan

participants or misrepresent the terms or administration of a plan." *Kamler*, 305 F.3d at 681 (quoting *Anweiler*, 3 F.3d at 991). Although "material facts affecting the interests of plan participants or beneficiaries" must be disclosed, not all errors in communicating information result in a breach of fiduciary duty under ERISA. *Id.* (quoting *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000)). The undisputed facts do not support a conclusion that Wells Fargo breached its duty here.

As noted, Neuma claims that Wells Fargo breached its fiduciary duty under ERISA by failing to inform Neuma, in the November 16, 1998 conversation between Heidrich and Fickett, that Ockhuysen's employment was due to terminate a month later. According to Neuma, by telling Heidrich only that Ockhuysen was still employed by Wells Fargo and directing Heidrich to submit a lump-sum premium for all of 1999, Fickett provided "incomplete and misleading information." (Pl.'s Mem., at 10–11.) Neuma does not contend that Wells Fargo had an affirmative obligation to disclose Ockhuysen's imminent termination absent a request for information from Neuma, but urges that once Heidrich inquired about Ockhuysen's employment status, Wells Fargo was "legally required" to advise Neuma of Ockhuysen's future termination. (Neuma's Reply Brief in Support of its Motion for Summary Judgment (hereinafter "Pl.'s Reply"), at 4.) Again, Neuma does not contend that any of the information Fickett provided to Heidrich was incorrect, nor that Wells Fargo failed to respond to Neuma's queries. Indeed, Heidrich did not ask anything about Ockhuysen's employment status beyond whether he was *currently* employed; Fickett answered accurately that he was. Nor does Neuma charge Wells Fargo with actually knowing that Neuma was unaware of Ockhuysen's termination at the time of the November 16, 1998 conversation. (Def.'s 56.1 ¶ 82.) Neuma's claim thus rests on the theory that Wells Fargo had a duty to provide Neuma with additional information that Neuma did not ask for, because Wells Fargo should have known that Neuma did not possess, and would require, that information.

It is true that an ERISA fiduciary's duty to communicate material facts affecting the interests of beneficiaries "exists when a beneficiary asks fiduciaries for information, and even when he or she

does not." *Anweiler*, 3 F.3d at 991. None of the authority cited by Neuma, however, supports a finding that Wells Fargo breached its duty in circumstances such as these. Rather, the cases Neuma cites involve defendants who took advantage of unsophisticated beneficiaries, either by failing to disclose material information they knew the beneficiary did not possess, or by affirmatively misrepresenting ERISA plan benefits. For instance, in *Anweiler*, the administrator of an employer's long-term disability plan asked a plan participant, the plaintiff's husband, to sign a reimbursement agreement naming Aetna the beneficiary of life insurance benefits to the extent of any overpayments of long-term disability benefits pending at the time of the his death. *Id.* at 990. The plaintiff argued that the request to sign the reimbursement agreement was a "veiled implication" that the agreement was a prerequisite to receiving disability benefits. *Id.* The Seventh Circuit agreed, holding that Aetna and the administrator breached their fiduciary duty because they did not inform the plaintiff's husband that the agreement was revocable at will, and that he was not required to sign it; indeed, the court noted that Aetna may have "manipulated" its position as insurer of both the life insurance and disability policies to ensure that one policy repaid the other. *Id.* at 991–92. Similarly, in *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 748–49 (D.C. Cir. 1990), the plaintiff, after learning that his employer was cancelling its group health policy, asked the insurer whether he could convert the employer-based coverage to an individual policy; however, the plaintiff used the word "continue" rather than "convert" when asking about his rights, and the insurer informed him he had no right to "continue" the policy. The court found that, once the plaintiff had "ma[de] known his predicament," the insurer breached its fiduciary duty by failing to inform the plaintiff that he was in fact entitled to convert the policy, and that the plaintiff should not be penalized simply because he was not sophisticated enough to understand and use the correct terminology. *Id.* at 751–52. Finally, in *Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3rd Cir. 1993), the plaintiff asked her husband's employer whether she qualified for a death benefit, and he responded, accurately, that she did not. Nonetheless, because there was information in the record suggesting that the employer knew when plaintiff asked her

question that the plaintiff's husband's death would leave her with substantial unpaid medical benefits that might be reimbursed through COBRA, the court held that it might have been a breach of fiduciary duty to fail to advise her of her COBRA options. *Id.* The court did not, as Neuma implies, hold that the employer had breached its duty; rather, the court held that summary judgment for the employer was inappropriate. *Id.* at 1302–03. The court expressly conditioned any finding of breach of duty on a finding, on remand, that the employer was actually aware of the beneficiary's particular circumstances and of the harm that would result from failure to disclose the additional COBRA information. *Id.*

The court finds the above authority inapplicable to the circumstances of this case. In contrast to *Anweiler*, there is no evidence of manipulation here; Neuma has never suggested that Fickett deliberately misled Heidrich when he called to verify Ockhuysen's employment. *Eddy* is distinguishable as well. There, although the plaintiff phrased his question one way, it was clear what he was really asking; nonetheless, the defendant declined to provide the answer simply because the plaintiff had not asked in the right way. Here, Heidrich's question to Fickett was simple and unambiguous: was Ockhuysen employed by Wells Fargo. It would not have been so clear to Wells Fargo, as it was to the defendant in *Eddy*, that Neuma required additional information. Moreover, Neuma's position is vastly different from that of the plaintiffs in *Eddy* and *Bixler*. Neuma is a sophisticated purchaser of insurance policies, one whose very business is entering into agreements with terminally ill beneficiaries of life insurance benefits, many of whom are covered by employer plans and presumably may be on disability leave. The rationale of the courts in *Eddy* and *Bixler* is thus absent in this case.

Most importantly, the defendants in the above cases share a common characteristic: they all knew, at the time they failed to disclose material information, that the beneficiary lacked that information. Here, as noted, Neuma does not charge Wells Fargo with knowing that Neuma was unaware of Ockhuysen's impending termination when Fickett told Heidrich that Ockhuysen was still employed. In fact, there is no indication in this record that Fickett herself was aware of

Ockhuysen's scheduled termination. Neuma has offered no evidence that Fickett even knew when she spoke to Heidrich that Ockhuysen was on disability leave. Wells Fargo has more than 150,000 employees. So far as this record shows, Fickett may have done nothing more than confirm Ockhuysen's status in a computer database. *See Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 817–18 (7th Cir. 1997) (citations omitted) ("ERISA does not require plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands of employees."). In short, there is no evidence here to suggest that Wells Fargo, aware that an uninformed, unsuspecting, or naive beneficiary lacked crucial material information, affirmatively misled Neuma about Ockhuysen's employment status.

Moreover, Neuma itself possessed information indicating that Ockhuysen's benefits were about to terminate. In previous litigation involving Neuma, one court attached great significance to the fact that Neuma possessed materials from which it could have determined, on its own, when the employee with whom it had executed a viatical agreement had been terminated. *See Neuma, Inc. v. E.I. Dupont De Nemours and Co.*, 133 F. Supp. 2d 1082, 1087 (N.D. Ill. 2001) ("*Dupont*"). In *Dupont*, the employee, O'Hara, had been terminated seven months before Neuma entered into the viatical agreement. *Id.* at 1084. Under the terms of O'Hara's life insurance policy, Dupont would continue to pay premiums for one year following termination, after which O'Hara would have 31 days to convert his group policy to an individual policy. *Id.* When Neuma, as O'Hara's assignee of all rights and benefits of the policy, failed to convert the policy within one year and 31 days of O'Hara's termination, the policy lapsed. *Id.* Neuma claimed that Dupont breached its fiduciary duty by failing to advise Neuma of its conversion rights or that O'Hara had been terminated. *Id.* Rejecting Neuma's claim, Magistrate Judge Levin noted that Neuma had "a plethora of evidence which was so conspicuous that, respectfully, if it had exercised reasonable care and diligence, Neuma would have known of O'Hara's termination and conversion expiration date." *Id.* at 1087. Such evidence included O'Hara's viatical application, which listed "N/A" for "employer," and a questionnaire completed by Dupont in which Dupont indicated the precise date on which coverage

would end.  *Id.* at 1086–87.  Neuma, the court held, thus had "constructive notice" of O'Hara's termination and end of coverage.  *Id.* at 1088–89.

In this case, although Neuma may not have had a "plethora" of information available to it, it is clear that by reviewing materials Neuma received from Ockhuysen upon entering into the Agreement, Neuma could have ascertained that Ockhuysen's coverage was in jeopardy as of December 1998.  In his viatical application, Ockhuysen stated that he was not working; that he had last worked on June 15, 1996; and that he was no longer able to work.  (Def.'s 56.1 ¶ 53.)  Wells Fargo's 1998 Benefits Book provided that employees on disability leave could maintain their life insurance coverage by paying the premiums, up to a maximum of 30 months.  (*Id.* ¶¶ 29–30.)  Neuma does not dispute that it received a copy of the 1998 Benefits Book upon entering into the Agreement.  Thus, Neuma knew that Ockhuysen was disabled and had been since June 1996, and by reviewing the Benefits Book and counting the months, Neuma would have known that Ockhuysen could maintain coverage only until December 1998.[24]  Neuma also received Plan materials and the "Important Notice to Assignee" from MetLife, both of which outlined the steps Neuma would have to take to convert Ockhuysen's insurance to an individual policy if his group coverage lapsed.  (*Id.* ¶¶ 65, 72–73.)  In other words, although Neuma argues that the only conclusion it could have reached after the conversation between Heidrich and Fickett was that Ockhuysen's benefits would continue through 1999, and that it was reasonable for Neuma not to have converted the Policy, the materials in Neuma's possession at the time suggest that such a conclusion would have been far from reasonable.

The question here, of course, is not what Neuma should have done, but what Wells Fargo should have done.  Nonetheless, in light of the information in Neuma's possession from which it could have gleaned that Ockhuysen's employment and/or benefits were in jeopardy, as well as

_____

[24]     Wells Fargo's 1997 Employee Handbook, which Ockhuysen admittedly received, explicitly states that an employee's "employment will end" if a leave reached 30 months.  (*Id.* ¶¶ 36-37.)  The record does not reveal whether Ockhuysen provided Neuma with a copy of this handbook upon entering into the Agreement.  If he did, Neuma could have predicted the exact date of Ockhuysen's termination.

Neuma's failure to show either that Wells Fargo was aware that Neuma lacked information about Ockhuysen's employment status, or that Wells Fargo affirmatively misled Neuma or provided incorrect information, the court concludes that the circumstances do not warrant a finding that Wells Fargo breached its fiduciary duty under ERISA. Accordingly, even if Neuma's claim were not barred as untimely, summary judgment for Wells Fargo would be appropriate on the merits.

Because the court finds in favor of Wells Fargo on Neuma's claims for recovery of benefits and breach of fiduciary duty, the court further declines to issue the declaratory relief Neuma seeks in Count I of the Complaint. The court thus grants Wells Fargo's motion for summary judgment on Counts I, II, and III.

## V. Failure to Produce ERISA Documents Pursuant to Section 1132(c)

ERISA requires plan administrators to provide information requested by plan beneficiaries, including a "summary plan description," within 30 days of such a request, or face a statutory fine. 29 U.S.C. § 1132(c)(1)(B); 29 U.S.C. § 1024(b)(4); *AMP*, 259 F.3d at 877. Only a "participant" or "beneficiary" is entitled to request plan documents and seek penalties for an administrator's failure of production. *AMP*, 259 F.3d at 878. A party is considered a beneficiary if it can show, both at the time it requested documents and when it filed suit, that it "had a colorable claim to vested benefits." *Id.* & n.10. As discussed above with regard to its recovery of benefits claim, Neuma did not have a colorable claim to vested benefits when it filed suit. Neuma thus does not have standing to assert its § 1132(c) claim.

Even if it had standing, Neuma has not shown that Wells Fargo failed to comply with its July 31, 2000 request for documents. Neuma argues that Wells Fargo violated § 1132(c) by failing to provide (1) a summary plan description; (2) a copy of the group life insurance policy issued by MetLife to Wells Fargo; or (3) a complete copy of the 1998 Benefits Book. (Pl.'s Reply, at 6.) The only evidence Neuma provides in support of this assertion is the Fishman Affidavit, in which Neuma attorney Howard Fishman claims that an attached exhibit is a "genuine and complete copy" of all documents provided by Wells Fargo on August 16, 2000. (Pl.'s 56.1 ¶¶ 31–32; Fishman Aff. ¶¶

1–2, Ex. 5 to Pl.'s 56.1.) As discussed, the court has stricken the Fishman affidavit, and Neum has offered no other evidence to rebut Wells Fargo's assertion that it provided, on August 16, 2000, a copy of the "master Plan document," the Policy, and a summary plan description. (Def.'s 56.1 ¶ 101.) The consequence of Neuma's lack of evidentiary support is that Wells Fargo would be entitled to summary judgment on Neuma's § 1132(c) claim.[25]

Even if the court were to accept the Fishman affidavit as fact, that would establish only that Wells Fargo neglected to include the two-page Appendix to the 1998 Benefits Book. The Appendix, which contains a chart listing ERISA plans sponsored by Wells Fargo, together with Chapters 1, 7, 10 of the Benefits Book, constituted a "summary plan description" of the Plan. (Sheean Dep., at 41:21–25, 42:19–23, 43:3–6.) Neuma claims that Wells Fargo did provide Chapters 1,7, and 10; thus, the court could conclude that Wells Fargo failed to provide a summary plan description only if the absence of the Appendix deprives the materials Wells Fargo allegedly provided of "summary plan description" status. Because Neuma lacks standing to pursue its claim, and because the court strikes the Fishman affidavit, the court need not decide whether Wells Fargo's alleged omission of

---

[25]     Neuma contends that even without the Fishman Affidavit, Neuma is entitled to summary judgment because its motion for summary judgment shifted the burden to Wells Fargo to set forth specific facts demonstrating the existence of a genuine issue for trial, and Wells Fargo has "utterly failed" to do so. (Pl.'s Reply, at 9.) *See* FED. R. CIV. P. 56(e); *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990). This is incorrect. First, Wells Fargo cites to the affidavit of Wells Fargo Senior Counsel Cara Sheean and the letter accompanying Wells Fargo's August 16, 2000 document production in support of its assertion that it provided relevant portions of the 1998 Benefits Book, the Policy, and a summary plan description. (Def.'s 56.1 ¶ 101; Sheean Aff. ¶ 13; Letter from Hernandez to Brodsky of 8/16/2000, Ex. F. to Sheean Aff., Ex. to Def.'s 56.1.) Second, Neuma, as the party seeking summary judgment, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Whetstine*, 895 F.2d at 392 (quoting *Celotex*, 477 U.S. at 323). As the party bearing the burden of proof on Wells Fargo's alleged failure to provide documents, Neuma is entitled to summary judgment only if it produces evidence sufficent to support a verdict in its favor on this issue. *See Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Neuma cites only to the Fishman Affidavit in its attempt to show that there is no issue of fact regarding the August 16, 2000 documents. (Pl.'s 56.1 ¶¶ 31–33.) Without the Fishman affidavit, there is no evidence that Neuma did not receive the documents Wells Fargo claims it produced.

the Appendix establishes, as a matter of law, that it failed to provide a summary plan description. The court observes, however, that Neuma's assertion that Wells Fargo "failed to produce . . . *any* summary plan description," (Pl.'s 56.1 ¶ 31) (emphasis added), is suspect, considering that only the Appendix was allegedly missing. As for Neuma's contention that Wells Fargo failed to produce a copy of the Policy, that assertion is, as the court has previously noted, again undermined by the very materials Fishman alleges that Wells Fargo provided. The documents identified by Fishman include a "Group Life Plan" containing the terms and conditions of Wells Fargo's group life policy and a certification statement from MetLife. (Group Life Plan, Ex. A to Fishman Aff., Ex. 5 to Pl.'s 56.1, at Neuma 0190.) Although the court need not decide the issue, the "Group Life Plan" thus appears to be the Policy.[26] In short, even considering the Fishman affidavit, Neuma would likely not be entitled to summary judgment on its § 1132(c) claim.

The court concludes that because Neuma had no colorable claim to benefits at the time it filed suit, Neuma is not a "beneficiary" as ERISA defines the term, and thus lacks standing to proceed under § 1132(c). Neuma has failed in any event to produce any competent evidence supporting its claim. Accordingly, the court grants summary judgment in favor of Wells Fargo on Neuma's § 1132(c) claim in Count IV of the Complaint.

## V.    Wells Fargo's Request for Sanctions

In moving to strike the Fishman affidavit, Wells Fargo also asks the court to sanction Neuma either by dismissing this action with prejudice and awarding Wells Fargo defense costs, or by awarding Wells Fargo all fees and costs in preparing its motion to strike. (Def.'s Mot. to Strike, at 3.) The court notes that the history of this action has been marked by numerous discovery disputes and requests for sanctions from both sides. Both parties' briefs on Wells Fargo's motion to strike the Fishman affidavit contain lengthy histories of the allegedly duplicitous and delaying tactics of

---

[26]    The court further notes that Neuma did not inform Wells Fargo that its August 16, 2000 document production had been incomplete until July 24, 2003, and that even then, Neuma's counsel did not claim that Wells Fargo had neglected to provide a "master plan document" or the actual group life policy. (Letter from Fishman to Sheean of 7/24/2003, Ex. J to Sheean Aff., Ex. to Def.'s 56.1.)

the other side. (*Id.* at 2–3; Pl.'s Strike Resp., at 7–10.) The court has declined to impose any requested sanctions up to this point, and is reluctant to do so now. Nonetheless, the court is troubled by Neuma's reliance on the improper Fishman affidavit. In the absence of any explanation to the contrary, the Fishman affidavit appears little more than an attempt to manufacture a factual dispute for purposes of surviving Wells Fargo's motion for summary judgment on Neuma's § 1132(c) claim. Accordingly, the court will invite Wells Fargo to submit a petition setting forth the fees and costs it incurred in preparing its motion to strike the Fishman affidavit.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (25) is granted. Plaintiff's motion for summary judgment (23) is denied. Defendant's motions to strike and for sanctions (40) are granted. The court will enter a judgment order on receipt of confirmation from Wells Fargo that it has in fact refunded Neuma's premium payments for Ockhuysen's 1999 coverage.

ENTER:

Dated: October 19, 2006

REBECCA R. PALLMEYER
United States District Judge